In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3291

WALTER V. LOVE,

*Plaintiff-Appellant,*

*v.*

JP CULLEN & SONS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:12 –cv-00689-NJ — **Nancy Joseph**, *Magistrate Judge.*

ARGUED DECEMBER 11, 2014 — DECIDED MARCH 9, 2015

Before WOOD, *Chief Judge*, and FLAUM and MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. In February 2008, Walter V. Love was dismissed from the construction site on which he worked after a physical altercation with another site worker. JP Cullen & Sons, Inc. was the general contractor responsible for the project. Cullen employed a subcontractor—Eugene Matthews, Inc.—who employed a second subcontractor—Union Contracting, Inc.—which in turn employed Love.

Love brought a Title VII action against Cullen, alleging that his job site dismissal was racially motivated. Since Cullen was not Love's direct employer, Love needed to demonstrate that Cullen could still be held liable under Title VII as his indirect employer. The district court concluded that Love failed to demonstrate such a relationship, and therefore granted summary judgment in favor of Cullen in September 2013. We now affirm.

## I. Background

J.P. Cullen & Sons, Inc. was the general contractor on the Milwaukee city hall renovation project ("city hall project"), which spanned from September 2005 through December 2008. One condition of Cullen's contract with the city was its compliance with the city's residency preference program, which required that a given percentage of all hours worked on certain city contracts be allocated to unemployed residents of a specified area. In order to ensure compliance with the residency program, Cullen selected a recruiting firm to aid in hiring.

One of Cullen's subcontractors on the renovation project was Eugene Matthews, Inc. ("EMI), which, under the terms of its contract with Cullen, was permitted to select its own subcontractors within certain parameters (for instance, Cullen required its subcontractors to hire union workers). One of EMI's subcontractors was Union Contracting, Inc. ("UCI"), which hired Walter V. Love to work on the city hall project. Love was hired by UCI as a foreman in June 2007, and his duties included shipping and receiving, managing laborers, and ensuring that necessary materials were on site and properly staged. Love expected to continue working for UCI after completion of the city hall project.

UCI, which had no contractual relationship with Cullen, paid Love's salary and provided all other benefits. UCI also set Love's hours. Scott Henninger, the job superintendent for UCI, received general work instructions from Cullen and passed those instructions on to Love. Cullen only gave specific directions about how to carry out assignments if it reviewed a finished product and found it unsatisfactory; under those circumstances, Cullen would communicate instructions for further work to a UCI supervisor.

Cullen's contract with EMI also required that EMI furnish all labor, materials, equipment, and services necessary to complete its work. However, Cullen did make a few bulk purchases of materials that it provided to EMI. Cullen also controlled physical access to the project site. It further required all subcontractor employees to attend periodic safety training meetings. However, Cullen provided no additional training or instruction. Most relevant to this appeal, in the event of "serious incidents" involving threats to workplace safety or worker productivity, Cullen retained the right to investigate alleged misconduct by its subcontractors' employees, to discipline them if necessary, and to permanently remove them from the job site. Cullen admits that it reserved the final decision regarding the continued presence of any worker on the project site.

On February 28, 2008, Love, who is African-American, was involved in an altercation with Arthur Mahan, another African-American employee of a different subcontractor. The facts of the altercation are disputed in this appeal. Love claims that Mahan confronted him and that Love attempted to verbally diffuse the situation. Cullen contends that Love

may have pulled a knife[1] during the altercation and enlisted other site workers as "enforcers" to seek revenge on Mahan after the quarrel concluded. As a result of the altercation, Cullen's superintendent, Don Berendsen, ordered both Mahan and Love permanently removed from the job site, even though Berendsen supposedly concluded that Mahan was the instigator. Berendsen apparently initially concluded that only Mahan should be removed, and that Love should be suspended from the job site for one day. However, Mahan's employer—Artega Construction—evidently became upset by this decision and demanded that Love also be removed from the job site. Berendsen agreed and ordered both Mahan and Love permanently removed.

Henninger, UCI's superintendent, attempted to persuade Berendsen to reinstate Love, but Berendsen refused. Love contends that Berendsen threatened to end the contract with UCI if Love was not removed. After his removal, Love was unable to secure further employment with UCI, which had no other pending projects to which it could assign him. According to Love, there was another physical altercation between two Caucasian workers at the city hall project site that was similar to the Love-Mahan argument, but resulted in no significant disciplinary action against either worker.

While Love's primary claim of racial discrimination derives from Cullen's removal of Love from the project site, Love also alleges several other instances of disparate treat-

---

[1] Love contends that Cullen's superintendent concluded that Mahan had lied about the knife, and that Love had a cellular phone in his hand instead. However, the particular details of the altercation are ultimately irrelevant to our determination of whether Cullen was Love's indirect employer for Title VII purposes.

ment on account of race that occurred prior to his dismissal. For example, Love notes that in November or December 2007, a Caucasian worker hung a noose at the construction site, which remained in place for two weeks despite numerous complaints to Cullen from African-American workers on the job site. Love also contends that Caucasian workers in the lunch area provided by Cullen routinely used the "N" word to describe their African-American coworkers. Love reported this behavior to Cullen's mason foreman, but Cullen made no attempt to stop the behavior. Love further contends that minority workers were repeatedly passed over for Cullen's "Partner of the Month" award.

Love filed suit in the United States District Court for the Eastern District of Wisconsin, alleging that Cullen discriminated and retaliated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Both parties consented to the entry of final judgment by a magistrate judge. Cullen moved for summary judgment on the ground that it was not Love's employer for Title VII purposes. Although the district court recognized that a defendant who is not a direct employer may nevertheless be subject to Title VII liability if the plaintiff demonstrates that the defendant functioned as a de facto or indirect employer, the court found that Love failed to make the requisite demonstration. The court ultimately concluded that "indirect employer liability depends on the amount of control a putative Title VII defendant exerts over the plaintiff's employment." *Love v. JP Cullen & Sons, Inc.*, 971 F. Supp. 2d 862, 865 (E.D. Wis. 2013). The court conducted a careful analysis of the nature and extent of the control that Cullen exercised over Love's employment and determined that, based on the undisputed evidence in the record, Cullen was

not Love's employer for Title VII purposes. The district court subsequently granted summary judgment to Cullen. Love appeals.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Stable Inv. P'ship v. Vilsack*, 775 F.3d 910, 915 (7th Cir. 2015). In reviewing a motion for summary judgment, the court must construe all facts and inferences in favor of the nonmoving party. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008). Summary judgment is appropriate when no genuine issue of material fact exists such that no reasonable jury could find for the nonmovant. *Hedberg v. Ind, Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir. 1995).

This appeal does not concern the merits of Love's racial discrimination claims. Rather, we analyze whether Cullen—who was not Love's direct employer—nevertheless exercised sufficient control over Love in the workplace such that Cullen is a proper defendant under Title VII. For reasons we articulate below, we conclude that Cullen exercised insufficient control over Love, such that no reasonable jury could conclude that Cullen was Love's indirect employer under Title VII.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII defines "employer" as "a person engaged in an industry affecting commerce who has

fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person," 42 U.S.C. § 2000e(b), while an "employee" is defined broadly, as "an individual employed by an employer." 42 U.S.C. § 2000e(f).

In order to bring a Title VII claim against Cullen, Love must prove the existence of an employer–employee relationship. *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991). It is undisputed that Love was not a direct employee of Cullen; rather, Love was an employee of UCI, a subcontractor of EMI, which was a subcontractor of Cullen. However, a plaintiff may have multiple employers for the purpose of Title VII liability. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1088 (7th Cir. 2008). It is also well established in this circuit that a plaintiff can, under certain limited circumstances, bring a claim against a defendant who is not his direct employer. *See EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995).

The district court stated that "the standard for determining when an entity is a de facto [or indirect] employer is unsettled" in this circuit. *Love*, 971 F. Supp. 2d at 865. The district court identified two allegedly distinct tests that we have applied to determine whether a defendant can be deemed an indirect employer. The first is a five-factor test, developed in *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d at 378–79. That test balances five factors relevant to an employer–employee relationship: (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of

payment and benefits; and (5) the length of the job commitment. *Id.*

The district court also articulated a second test, which considers the amount of control exerted by the alleged de facto employer, *see EEOC v. Illinois*, 69 F.3d at 169, with a particular emphasis on the "economic realities" of the employment relationship. *Tamayo*, 526 F.3d at 1088. Indeed, the parties also treat the "economic realities" inquiry and the *Knight* five-factor analysis as competing standards. However, the five-factor *Knight* test and the "economic realities" test are not two independent, mutually exclusive inquiries. Rather, the *Knight* test is merely a more structured analysis of whether the putative employer exercised sufficient control, and whether the "economic realities" are such that the putative employer can be held liable under Title VII.

In *Knight* itself, we conceptualized the five factors as an operationalization of the "economic realities" test:

> [I]n reaching this conclusion [that plaintiff was an independent contractor rather than an employee], the court correctly recognized the use of the "economic realities" test which involves the application of the general principles of agency to the facts. Of several factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor.

*Knight*, 950 F.2d at 378–79 (citations omitted). The *Knight* court went on to recite the five factors relied upon by the district court, *id.*, to which subsequent decisions have cited

as helpful in resolving whether an entity constitutes an employer for Title VII purposes. *See e.g.*, *Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2008); *see also Heinemeier v. Chemetco, Inc.*, 246 F.3d 1078, 1082 & n.3 (7th Cir. 2001) (stating that "[w]hen facing questions regarding the employer–employee relationship under Title VII … we 'look to the 'economic realities' of the relationship and the degree of control the employer exercises'" (citing *Knight*, 950 F.2d at 378–80, and articulating the five *Knight* factors)).

Furthermore, the five-factor *Knight* test and the "economic realities" inquiry are not substantively incompatible. The "economic realities" test purports to examine the amount of control that a de facto employer had over a plaintiff, while also considering the financial underpinnings of the relationship. The *Knight* five-factor analysis also examines the issue of control, by asking who provided the relevant materials and instructions to the plaintiff, as well as the financial parameters of the employment arrangement, by inquiring about form of payment and benefits. Thus, the five *Knight* factors are simply a more detailed application of the economic and control considerations present in the "economic realities" test. We therefore proceed by examining each *Knight* factor to determine both how much control Cullen exerted over Love, and also what the economic realities of their relationship were, in order to determine whether Cullen may be liable under Title VII.

The first of the five *Knight* factors examines the extent to which the putative employer controlled or supervised the alleged employee, including whether the employer provided direction with respect to scheduling and performance of the work. *Knight*, 950 F.2d at 378. As we noted in *Knight*, the

employer's right to control is the "most important" consideration in ascertaining the existence of an employer–employee relationship. *Id.* In *Alexander v. Rush North Shore Medical Center*, we observed in our application of the "control factor" that "[i]f an employer has the right to control and direct the work of an individual, *not only as to the result to be achieved, but also as to the details by which that result is achieved*, an employer/employee relationship is likely to exist." 101 F.3d 487, 493 (7th Cir. 1996) (emphasis added). Here, Love generally received instructions directly from UCI. If Cullen reviewed a finished product and found it unsatisfactory, Cullen would communicate any further instructions to a UCI supervisor. This minimal supervision is essentially limited to "the result to be achieved," which militates against a finding of control.

However, our control analysis is further informed by this court's opinion in *EEOC v. Illinois*, where we emphasized that, when control is examined, "the key powers are, naturally, those of hiring and firing." 69 F.3d at 171. Although *EEOC* dealt specifically with a claim brought under the Age Discrimination in Employment Act (ADEA), it also considered the standard for establishing an employer–employee relationship under Title VII. The *EEOC* court noted that if a defendant "pull[ed] the strings in the background … a point would soon be reached at which the [defendant] was the de facto employer and the [direct employers] merely its agents." *Id*. at 171–72.

Love argues that Cullen controlled his hiring because Cullen required its subcontractors to hire union workers. Cullen's contract with the City of Milwaukee required that Cullen abide by the residency preference program, and in

order to ensure compliance, Cullen selected a recruiting firm to assist with the hiring of subcontractors. However, there is no evidence that Cullen had any specific involvement in Love's hiring—UCI hired its own employees, including Love.

Yet the question of Love's firing is a closer one. One of the crucial powers that Cullen retained with respect to Love was the ability to remove him permanently from the work site, which, in this case, essentially amounted to a termination of Love's employment with UCI. Cullen admits that it retained the final decision regarding the continued presence of any worker on the project site if that individual presented a threat to workplace safety or worker productivity or well-being. Here, Cullen ordered Love's permanent removal from the job site, over the objection of Love's direct supervisor, UCI superintendent Henninger, who asked Cullen to keep Love on the project. Love even asserts that Cullen threatened to end UCI's contract if Henninger did not comply with Love's removal. Because UCI had no other jobs to which it could assign Love at the time, Love argues that his removal from the project rendered him effectively unemployed.

However, the record lacks any evidence that Cullen attempted to jeopardize Love's continued employment with UCI or his placement on other UCI projects. The fact that no other UCI projects were available when Cullen dismissed Love from the city hall project was wholly unrelated to Cullen's actions. And while it is true that Cullen had the ability to unilaterally remove Love from the job site without the consent of UCI, it is still true that Cullen did not directly hire Cullen, did not set his hours, and did not directly supervise his work. Therefore, Cullen's workplace control over Love—

or lack thereof—weighs in favor of finding that Cullen is not Love's indirect employer under Title VII.

The second factor in evaluating an indirect employment relationship is the type of occupation and nature of the skills required for the position in question, "including whether skills are obtained in the workplace." *Knight*, 950 F.2d at 378. Cullen required the employees of all subcontractors to attend periodic safety training meetings, but this was the only instruction Cullen provided; any other training was provided to Love by UCI. We conclude that this safety training alone is insufficient to weigh in favor of an employer–employee relationship here. It is expected that a general contractor will provide broad safety instructions to anyone working on its construction site. This small amount of control is not what we had in mind in *Knight* when we articulated this factor. In *Knight*, the district court previously concluded that while the plaintiff obtained training from her putative employer, because the plaintiff was free to leave the company at any time and use her skills elsewhere, this weighed in favor of finding that the company was not the plaintiff's employer under Title VII. *Id.* at 379. We agreed with the district court's analysis, concluding that "it was her application of those skills that mattered" in determining whether an employer–employee relationship existed. *Id.* at 380. Here, Love obtained minimal instruction from Cullen in the form of safety trainings, and he was very likely able to use the information that he learned from these trainings on other construction jobs. Thus, Cullen's safety trainings do

not weigh in favor of finding that Cullen was Love's indirect or de facto employer under Title VII.[2]

The third *Knight* factor relates to whether the putative employer was responsible for the costs of operation, including the costs of "equipment, supplies, fees, licenses, workplace, and maintenance of operations." *Id.* at 378. Cullen's contract with EMI required that EMI—not Cullen—furnish all labor, materials, equipment, and services necessary to complete its work. (Presumably, EMI provided these materials to UCI, which in turn provided them to Love.) Because it was EMI—rather than Cullen—that ultimately provided materials to Love, this factor also weighs against finding an employer–employee relationship between Cullen and Love.[3]

The fourth factor, which considers whether the putative employer was responsible for providing payment and benefits, *Knight* 950 F.2d at 378–79, also cuts against Love's position. Love received all paychecks and W–2s directly from UCI, not Cullen. There is no indication that Cullen ever paid

---

[2] Our conclusion is consistent with the understanding of more than one district court in this circuit. *See, e.g.*, *Fly v. Walsh Constr. Co.*, No. 3:10-CV-126, 2011 WL 6152193, at *2 (N.D. Ind. Dec. 12, 2011); *see also EEOC v. Foster Wheeler Constr., Inc.*, No. 98-C-1601, 1999 WL 515524, at *4 (N.D. Ill. July 14, 1999) (noting that "[s]ome subcontractor employees may have attended [Foster Wheeler]'s new hire orientation," but finding this fact did not rise to the level of establishing an employment relationship).

[3] Love notes that Cullen made a few bulk materials purchases, which it then provided to EMI. EMI, however, was one step removed from Love in the contractor–subcontractor chain (EMI hired UCI, which in turn hired Love). However, to hold that Cullen's actions of providing materials to EMI had the effect of creating an employer–employee relationship with Love would seem to over-exaggerate the significance of those actions as they relate to Cullen's relationship with Love.

Love for his work, or that Cullen provided Love any other benefits of employment, such as insurance or vacation time. Still, Love argues that Cullen effectively dictated his wages, which weighs in favor of an employer–employee relationship. *See e.g.*, *Heinemeier*, 246 F.3d at 1083. Love argues this, however, by emphasizing that Cullen required all subcontractors to hire union workers, whose wages are controlled by the union. This is ultimately irrelevant. In *EEOC*, we concluded that fixing a minimum salary for teachers "is after all not much different from fixing a minimum wage for private as well as public employees, and no one supposes that the federal government is the indirect employer of all the workers covered by the federal minimum-wage law." 69 F.3d at 171. Therefore, we conclude that the payment and benefits factor also weighs against finding that Cullen is Love's indirect employer. In other words, the "economic realities" of Cullen's relationship with Love were not such that we should regard Cullen as Love's de facto employer under Title VII.

The final *Knight* factor, which examines the length of the employee's job commitment and/or the expectations of the parties, 950 F.2d at 379, also weighs against Love's argument that Cullen is his indirect employer. Love worked on the city hall project from June 2007 until February 2008, or roughly eight months. It is undisputed that Love intended to remain employed with UCI—not Cullen—after the city hall project was completed. The record reveals no expectation on the part of Cullen that Love would continue working on Cullen's projects, nor does it reveal that Love expected the same. Given these expectations, we cannot conclude that this factor weighs in favor of an employer–employee relationship here.

Based on our application of the five-factor test, Love cannot demonstrate that Cullen "so far controlled [his] employment relationship that it was appropriate to regard [Cullen] as [his] de facto or indirect employer." *EEOC v. Illinois*, 69 F.3d at 169. Although we have previously held that a plaintiff can survive summary judgment even when not all factors support him, *see e.g., Worth v. Tyer*, 276 F.3d at 264, Love's case is distinct in that *none* of the factors assessing Cullen's level of control weigh in Love's favor. In *Worth*, we held that an issue of material fact existed with respect to whether the plaintiff was an employee of the defendant, even when some of our control analysis cut in favor of finding no employment relationship. *Id.* We explained that although plaintiff set her own schedule and did not receive health insurance, sick leave, or vacation time, *id.* at 263–64, she could nevertheless be deemed defendant's employee because "[defendants] controlled all of Worth's work actions by setting her hours, assigning her projects and approving her work. … Defendants provided all the costs of operation for Worth's work, and Tyer and Worth discussed the possibility of being promoted." *Id.* at 264 (citations omitted). Here, none of these considerations support Love's argument. Cullen did not set Love's hours, did not assign or directly supervise his projects, and did not have the ability to promote or demote Love, aside from its ability to remove Love from the job site for safety reasons. Additionally, the control factors lacking in *Worth* are also absent here for Love—such as the fact that Cullen did not provide Love with health insurance, sick leave, or vacation time. On these facts, a reasonable jury could not find that Cullen exercised sufficient control over Love to be considered his indirect employer under

Title VII, and we therefore find that the district court's grant of summary judgment in favor of Cullen was appropriate.

Finally, in addition to his arguments about control, Love contends that an issue of fact remains as to whether Cullen was his indirect employer because Cullen "directed the discriminatory act, practice, or policy of which [Love] is complaining." *Worth*, 276 F.3d at 260. Indeed, cases from this circuit have stated that an entity other than the direct employer "may be considered an employer under Title VII … if the [entity] 'directed the discriminatory act, practice, or policy of which the employee is complaining.'" *Tamayo*, 526 F.3d at 1088. Exclusive of other considerations, it initially appears that Love makes a colorable argument that Cullen directed the allegedly discriminatory act, as it was Cullen that made the decision to remove Love from the city hall project, over the objection of Love's direct employer UCI.

However, two problems arise with Love's argument. First, the "discriminatory act," that Love complains of is—for Title VII purposes—his firing, which he claims is synonymous with his dismissal from the city hall project job site. However, in assessing Cullen's level of control over Love, we determined that Cullen's dismissal of Love from the city hall project was qualitatively different from the termination of Love's employment relationship with UCI. In fact, we concluded above that, on the record before us, Cullen had no effect on Love's continued employment with UCI, even if UCI happened not to have any jobs to which it could assign Love after his city hall project dismissal. Therefore, in assessing whether Cullen "directed the discriminatory act," we first question that Love's dismissal from the city hall project

can be properly characterized a "discriminatory act" under Title VII.

Second, evidence that a de facto employer "directed the discriminatory act" is not—without more—enough to establish a de facto employer–employee relationship under Title VII. In *Tamayo v. Blagojevich*, we considered whether the putative employer "directed the discriminatory act," but concluded that the de facto employer—the Illinois Department of Revenue ("IDOR")—exercised sufficient control over the plaintiff such that it was a proper defendant under Title VII. 526 F.3d at 1089. We cited to evidence in the plaintiff's complaint alleging that IDOR controlled the plaintiff's compensation, which was especially relevant given that the plaintiff's suit was based on an alleged gender-based disparity in pay. Here, while Cullen's involvement in Love's dismissal from the city hall project is certainly relevant to their relationship, it is not enough to overcome our analysis under the *Knight* factors, which shows that Cullen—in the aggregate—exercised very little control over Love in the course of their relationship. For these reasons, this final consideration does not alter our conclusion that Cullen exercised insufficient control over Love, and that Cullen is not liable as an indirect employer under Title VII.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.