In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1935

WILLIAM BRIDGE,

*Plaintiff-Appellant,*

*v.*

NEW HOLLAND LOGANSPORT, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:12 CV 360 — **James T. Moody**, *Judge.*

ARGUED NOVEMBER 9, 2015 — DECIDED MARCH 9, 2016

Before WOOD, *Chief Judge*, ROVNER, *Circuit Judge*, and
SHAH, *District Judge*.[*]

SHAH, *District Judge.* William Bridge was fired from his
job at New Holland Logansport in March 2011, when he was
61 years old. Bridge sued Logansport under the Age Dis-
crimination in Employment Act, 29 U.S.C. § 621 *et seq.*, which

[*] Of the Northern District of Illinois, sitting by designation.

prohibits employers from discharging individuals because of their age, *id.* § 623(a)(1). The statute defines "employer" as someone who has twenty or more employees for each working day, in each of twenty or more calendar weeks, in the calendar year of (or in the year preceding) the discriminatory act. *Id.* § 630(b). After concluding that New Holland Logansport did not have twenty or more employees, the district court granted Logansport's motion for summary judgment. We affirm.

**I**

New Holland Logansport, an Indiana-based company that sold farm equipment, was one of several commonly-owned corporations. Another was New Holland Rochester. The two companies operated as separate stores, maintained separate bank accounts, and generated their own invoices. Each company filed its own tax returns (though both used on their respective returns New Holland Rochester's address, and tax records for both companies were kept at that location). Store inventories were also maintained individually; however, Rochester employees could view Logansport's inventory (and vice-versa) through a shared computer program. According to Bridge, the two companies also shared certain equipment, such as trucks used for hauling, and ordered motor oil together in order to get a discount. Money collected at Logansport was delivered each day to the Rochester location, and a Rochester employee would take the cash to the bank for deposit. Although each company was responsible for its own advertising, both were featured on the same website (www.newhollandrochester.com).

New Holland Rochester and New Holland Logansport were, as just noted, commonly owned. Jim Straeter owned

all of Rochester's shares and 87.5% of Logansport's shares; Mike Stephenson, Logansport's general manager, owned the remainder of Logansport's stock. Stephenson and Straeter, along with Straeter's wife, Melinda, made up the board of directors for Logansport. The Straeters (but not Stephenson) served as directors for Rochester. There was some overlap in personnel, too: Melinda Straeter coordinated payroll for Rochester and Logansport; Bob Cannedy did human-resources work for both companies (and stored personnel files for employees of both corporations at his office in Rochester); and Stacy Conner did accounting for each. Workers at both companies were subject to the same personnel policy and enjoyed the same employee benefits, and holiday parties were combined (as were monthly sales meetings and informational meetings about changes in health insurance). Computer-training sessions for employees of both companies were held at Rochester, and Logansport's financial records were kept there, as well. Bridge's paychecks were sent to him from the Rochester location. Operations were otherwise managed separately, with Stephenson in charge at Logansport and Cannedy and Jim Straeter at the helm in Rochester.

Bridge worked at New Holland Logansport from October 2000 to March 2011, when he was terminated. Stephenson fired Bridge, though Stephenson told Bridge that the decision was actually Jim Straeter's, and that Stephenson—who did not want to let Bridge go—was merely following Straeter's instructions. At all times during the year Bridge was fired (and in the preceding calendar year), Logansport listed on its payroll fewer than 20 individuals. The payroll fluctuated between 17 and 18 employees in 2011, and between 16 and 19 employees in 2010.

Bridge sued New Holland Logansport in June 2012, alleging discrimination in violation of the ADEA. The district court granted summary judgment to Logansport, concluding that Logansport did not have enough employees to qualify as an "employer" under the statute.

## II

We review *de novo* the district court's grant of summary judgment, and construe all facts and draw all reasonable inferences in Bridge's favor. *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015) (citation omitted). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A

To qualify as an "employer" under the ADEA , one must have twenty or more employees for each working day, in each of twenty or more calendar weeks, either in the calendar year of or the year preceding the alleged discrimination. 29 U.S.C. § 630(b). Bridge was fired in 2011, and the parties agree that New Holland Logansport did not have on its payroll twenty or more employees in either 2011 or 2010. Logansport did, however, have at least seventeen formal employees during much of this time, and Bridge contends that three individuals employed by New Holland Rochester (Bob Cannedy, Stacy Conner, and Melinda Straeter) also maintained employment relationships with Logansport—thus bringing the latter within the ADEA's reach. The district court concluded that none of these individuals was employed by New Holland Logansport, and that even if they were, still they could not be counted toward the ADEA's

statutory minimum because they were at most part-time employees.

Part-time status does not preclude counting an employee toward the twenty-person minimum. Whether an individual was "employed" by someone on a particular working day depends not on whether (or the extent to which) the individual actually worked that day, but on whether there was an employment relationship at that time. *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206–08 (1997) (describing the proper employee-counting method for Title VII cases).[1] The question here, then, is whether New Holland Logansport maintained an employment relationship with Cannedy, Conner, or Melinda Straeter in 2010 or 2011 (and if so, whether that relationship existed for twenty or more weeks in that calendar year).

Bridge argues that these individuals necessarily maintained employment relationships with New Holland Logansport, because they were not "independent businesspeople"—that is, Cannedy was not formally employed by a human-resources company, Conner was not employed by an outside accounting firm, and Melinda Straeter did not work for or own a separate payroll company. But the issue is not whether these individuals were "independent" from Logansport in the sense that they were self-employed or worked for non-New Holland companies: everyone agrees that these workers were directly employed by New Holland

---

[1] Title VII defines "employer" in the same way as the ADEA, except that the former requires only fifteen employees (in twenty or more calendar weeks) while the latter demands twenty. *Compare* 42 U.S.C. § 2000e(b) *with* 29 U.S.C. § 630(b).

Rochester. The question is whether Cannedy, Conner, or Melinda Straeter also had an indirect employment relationship with New Holland Logansport, such that they were jointly employed by both corporations. *Cf. Tamayo v. Blagojevich*, 526 F.3d 1074, 1088 (7th Cir. 2008) ("[M]ultiple entities may be considered an employee's 'employer' for the purposes of Title VII liability.") (citation omitted). To determine whether there existed an employer-employee relationship with Logansport, we look to the economic realities of the work situation. *See Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015). Five factors, derived from principles of agency law, are useful. They are: (1) the extent of the putative employer's control and supervision over the putative employee; (2) the kind of occupation and nature of skill required; (3) the putative employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment. *Id.* (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)).

We consider first the most important *Knight* factor: the extent to which the putative employer controlled the alleged employee. *See Love*, 779 F.3d at 702–03. Control depends, to a significant degree, on the ability to hire and fire. *See id.* at 703 (discussing *EEOC v. Illinois*, 69 F.3d 167, 171 (7th Cir. 1995)). Logansport's manager, Mike Stephenson, had the authority to hire and fire Logansport employees. Cannedy, Conner, and Melinda Straeter, however, were not formally employed by New Holland Logansport, and the record is silent as to whether Stephenson could have terminated Logansport's relationship with any of them. Also relevant is whether the putative employer had the right to control and direct an individual's work, "not only as to the result to be achieved, but

also as to the details by which that result is achieved." *Id.* (quoting *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996)) (emphasis omitted). But Bridge points to no evidence that Stephenson had, with respect to Cannedy, Conner, or Melinda Straeter, any authority of this kind. There is no suggestion that Stephenson dictated these individuals' duties, set their schedules, or otherwise supervised the performance or execution of their work. Bridge has not shown that New Holland Logansport exercised over these individuals the kind of control indicative of an employer-employee relationship.

The second and third *Knight* factors concern, respectively, the type of occupation and nature of skills required for the job, and the responsibility for operating costs. If important job skills were obtained in the putative employer's workplace, this suggests an employment relationship. *See Love*, 779 F.3d at 704 (citing *Knight*, 950 F.2d at 378). There is no evidence that Cannedy, Conner, or Melinda Straeter received any training or instruction from New Holland Logansport. Nor is there any evidence that Logansport provided to these persons special equipment or materials for their work. Overhead costs, moreover—at least with respect to Conner—appear to have come from Rochester, since, according to Jim Straeter, Rochester invoiced Logansport for her services. Bridge questions Straeter's credibility on this point, emphasizing that although Logansport included in its summary-judgment exhibits a number of invoices, none was for Conner's accounting services. The invoices provided at summary judgment (which included invoices from both New Holland Logansport and New Holland Rochester) were offered to show that the two companies billed their customers separately, and maintained separate addresses. The in-

voices in the record are therefore irrelevant to whether Rochester in fact billed Logansport for Conner's work, and do not dispute Straeter's competent testimony that the billing occurred as he described. Both the second and third *Knight* factors militate against a finding of employee status.

The fourth factor considers whether the putative employer was responsible for providing payment or benefits. *Love*, 779 F.3d at 704 (citing *Knight*, 950 F.2d at 378–79). This factor, too, weighs against a finding that Logansport had an employment relationship with Conner, Cannedy, or Melinda Straeter. There is no evidence that Logansport ever paid any of these individuals for their work or withheld taxes from their paychecks. *See Worth v. Tyer*, 276 F.3d 249, 264 (7th Cir. 2001). And while employees from both companies participated in the same group health-insurance plan, there is no indication that Logansport provided any direct benefits to the three individuals now at issue.

The fifth and final *Knight* factor addresses the length of the job commitment and the parties' expectations as to that commitment. *See Love*, 779 F.3d at 705 (citing *Knight*, 950 F.2d at 379). The parties' expectations are in this case unclear. It could be that the businesses (or, more accurately, those who ran them) expected Cannedy, Conner, and Melinda Straeter to work at Logansport for only a limited period of time; but the evidence reasonably suggests no particular endpoint, and, viewing the record in Bridge's favor, a reasonable juror could infer that an ongoing commitment was contemplated. This factor therefore supports Bridge's position. Nevertheless, we are not persuaded that the circumstances suggest an employment relationship with New Holland Logansport. A mutual expectation of continued work is not, of itself, indica-

tive of the kind of extensive control on which a finding of employee status is typically based. Logansport did not exercise such control over Cannedy, Conner, or Melinda Straeter, and the evidence does not permit the conclusion that any of these individuals was a Logansport employee.

Bridge relies on *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205 (7th Cir. 1986), for the proposition that two companies "employ" an individual when they share his services. *Karr* is inapposite. That case turned on a regulation under the Fair Labor Standards Act providing that a joint-employment relationship (to determine responsibility for minimum wage payments) may exist under the FLSA where, for example, there is an arrangement between employers to share an employee's services. 29 C.F.R. § 791.2(b). The regulation in *Karr* has no counterpart under the ADEA, so its construction is irrelevant here. Moreover, we have since explained that regulations of this sort—even where they do apply—have limited value in determining whether a joint-employment relationship in fact exists. *See Moldenhauer v. Tazewell-Pekin Consol. Communications Ctr.*, 536 F.3d 640, 643–44 (7th Cir. 2008) (discussing a similar regulation promulgated under the Family and Medical Leave Act). The joint-employment analysis turns—as does any assessment of a putative employment relationship—on the totality of the circumstances, with a particular focus on the control exercised by the alleged employer over a person's working conditions. *See id.* at 644 (citing *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408 (7th Cir. 2007)); *see also Tamayo*, 526 F.3d at 1088–89 (addressing a multiple-employer issue under Title VII); *Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 802, 810 (7th Cir. 2014) ("[A]n entity other than the actual employer may be considered a 'joint employer' only if it exerted significant

control over the employee." (quoting *G. Heileman Brewing Co. v. NLRB*, 879 F.2d 1526, 1530 (7th Cir. 1989))) (emphasis and internal quotation marks omitted). It is this kind of control that was absent here.[2]

B

Even if Logansport was not Cannedy's, Conner's or Melinda Straeter's joint employer, it is covered by the ADEA if, for employee-counting purposes, all of Rochester's employees are aggregated with Logansport's employees. The aggregation inquiry, which asks whether *all* of an affiliate's employees should be counted toward the defendant's statutory minimum, is distinct from the economic-realities analysis, which addresses whether *particular* individuals should count because of an indirect employment relationship with the defendant.

Employee aggregation is an unusual step: corporations—even if related to a certain extent—are separate entities, and are treated accordingly. As we explained in *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999), however, there are instances where it is appropriate to disregard this separate-

---

[2] Bridge also relies on guidance from the Equal Employment Opportunity Commission (the entity authorized to issue rules and regulations under the ADEA, *see* 29 U.S.C. § 628), which states in Section 2-III(B)(1)(a)(iii)(b) of its Compliance Manual that all joint employees should be counted toward the statutory minimum for each of their joint employers. This instruction is of no help to Bridge. Bridge cannot count Cannedy, Conner, or Melinda Straeter as New Holland Logansport's "joint" employees unless he has first shown that they were *employed*— either directly or indirectly—by that company. *Cf. id.* ("The term 'joint employer' refers to two or more employers … *that each exercise sufficient control of an individual to qualify as his/her employer*.") (emphasis added).

ness, and to deem each affiliate as having the number of employees that the enterprise has in total. Such instances arise where: (1) the enterprise has purposely divided itself into smaller corporations to dodge requirements imposed by the anti-discrimination laws; (2) a creditor of one corporation could, by piercing the corporate veil, sue its affiliate; or (3) the affiliate directed the discriminatory act or practice of which the plaintiff complains. *See id.* at 940–42.

Bridge does not argue that the New Holland enterprise purposely split itself up to avoid the anti-discrimination laws. He argues that employee aggregation is proper here because New Holland Rochester, through its owner Jim Straeter, directed that Bridge be fired from his job at Logansport, and because the conditions for veil-piercing are also present.

Veil-piercing is governed by state law, and in this case we look to Indiana law because the New Holland entities were incorporated there. *See Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009).[3] The Indiana courts, like others, consider many factors in determining whether a corporate veil may be pierced, *see National Soffit & Escutch-*

---

[3] Bridge argues that the veil-piercing analysis should be governed by federal common law, not state law, as liability is asserted under a federal statute. It is true that "a state's restrictive law of veil piercing is not allowed to undermine the effectiveness of a federal statute." *Illinois Bell Tel. Co., Inc. v. Global NAPs Ill., Inc.*, 551 F.3d 587, 598 (7th Cir. 2008). But Bridge makes no argument—and nor is it otherwise apparent—that Indiana law on veil-piercing is unduly restrictive of the policies underlying the ADEA. The principles of state law provide appropriate guideposts here. *Cf. Worth*, 276 F.3d at 260 (applying state-created standards for veil-piercing in determining liability under Title VII).

*eons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265–66 (7th Cir. 1996); *Reed v. Reid*, 980 N.E.2d 277, 301–02 (Ind. 2012), but the focus is on whether "the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice," *Reed*, 980 N.E.2d at 301 (quoting *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)).

New Holland Logansport and New Holland Rochester did do a fair amount of sharing. They shared similar names; they shared directors (Jim and Melinda Straeter were members of both boards); and they shared certain employees' services (Cannedy's, Conner's, and Melinda Straeter's, as discussed above). Cannedy conducted performance reviews for both companies' employees—who also received the same personnel manual, attended the same holiday party, and accessed the same computer program for tracking inventories. Health-insurance benefits were centralized, and the companies used the same address on their tax returns (a curious practice, given that the companies otherwise maintained separate business addresses). They also shared a website. All of this bespeaks a certain degree of integration between the two corporations. What it does not suggest is a misuse of corporate form. "The corporate veil is pierced, when it is pierced, not because the corporate group is integrated, [but] because it has neglected forms intended to protect creditors from being confused about whom they can look to for the payment of their claims." *Papa*, 166 F.3d at 943 (citing Phillip I. Blumberg, *The Law of Corporate Groups: Substantive Law* § 20.05, p. 114 (1987)). There was no such confusion here. Though board membership overlapped, the two boards were otherwise separate. Each company had its own invoices and

its own bank account[4], and filed its own tax returns. The companies operated out of separate locations, maintained separate inventories, and were responsible for their own advertising. Operations were also managed individually—by Stephenson at Logansport, and by Jim Straeter (and Bob Cannedy) at Rochester. Even when viewed in Bridge's favor, these facts fall short of suggesting that Logansport was "so organized and controlled and its affairs … so conducted by [Rochester] that it [was] a mere instrumentality or adjunct" of the latter. *Reboy v. Cozzi Iron & Metal, Inc.*, 9 F.3d 1303, 1308 (7th Cir. 1993); *see also Papa*, 166 F.3d at 939, 942.

Bridge points to the company website as evidence that the corporations held themselves out to the public as a single entity. The website (www.newhollandrochester.com), captioned "New Holland Agriculture," greeted visitors with the following:

> Since *our* first dealership, New Holland Rochester, was established in 1983, *we* have been working ever since to be a leader in providing the equipment, parts, technology, and service to help meet *our* customer's [*sic*] needs.

> Here you can find information involving New Holland, search *our* used equipment, and find out what is happening at *our* locations in Roch-

---

[4] Bridge suggests that the two corporations may have commingled assets, but there is no evidence of this. Money collected at Logansport was taken each day to Rochester, and a Rochester employee would take the money to the bank for deposit. There is no indication that funds collected by one entity were ever deposited into the other's (separate) bank account.

ester, Logansport, Rossville, Bluffton, and Centerville in Indiana.

(emphases added). Viewed in isolation, these statements do imply that New Holland—specifically, "New Holland Agriculture"—was a single company with multiple store locations. *See Parker v. Scheck Mech. Corp.*, 772 F.3d 502, 503, 507 (7th Cir. 2014). But a preceding statement makes clear that the "locations" corresponded to different corporations:

> Welcome to the website for the following *companies*: New Holland Rochester, Inc., New Holland Logansport, Inc., Rodkey New Holland Inc., New Holland Tri-County, Inc., Ag Technologies, Inc., and New Holland Centerville, Inc.

(emphasis added). A "Locations" webpage also listed a different address for each company. Nothing in this suggests that corporate forms were so ignored or manipulated as to perpetrate a fraud on the companies' creditors. Though the operations of these two small businesses were in some ways combined, their identities were separate enough that piercing the veil between affiliates would be inappropriate here.

We turn, then, to Bridge's argument that all New Holland Rochester employees should be counted as Logansport employees because it was Rochester, not Logansport, that caused Bridge to be fired from his job. Employees of affiliated corporations may be counted in the aggregate for purposes of 29 U.S.C. § 630(b) if it was the affiliate, not the plaintiff's employer, that directed the discriminatory act, practice, or policy of which the plaintiff now complains. *See Papa*, 166 F.3d at 941.

It was Mike Stephenson, operations manager at Logansport, who fired Bridge. Stephenson, however, told Bridge that the decision was actually Straeter's, so for purposes of summary judgment, we assume that Straeter was responsible. But in what capacity? Straeter was operations manager at Rochester, not Logansport, so Bridge contends that Straeter must have been acting on Rochester's behalf when he directed that Bridge be let go. But Straeter was also an owner and director—of Rochester *and* of Logansport. Where the same officer or director works for two separate but commonly-owned entities, he at times represents one corporation and at times represents the other. That is, he "changes hats." *See Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997) (citation omitted). There are no facts from which it may reasonably be inferred that, when Straeter told Stephenson to fire Bridge, Straeter was wearing anything but a Logansport hat. Straeter, a Logansport owner and director, instructed the Logansport manager (also a co-owner and director of that corporation) to fire a Logansport employee. What has Rochester to do with it? Bridge emphasizes that Straeter had a Rochester email address, and that the meeting between Straeter and Stephenson occurred at Rochester; but there is no evidence that Straeter conducted only Rochester business at his office (his only office), and there is no dispute that Straeter had responsibilities with both companies. Neither the email address nor the location of the meeting signals anything about the company Straeter represented when he directed Bridge's firing. To defeat summary judgment on an issue on which he bears the ultimate burden of proof, Bridge was required to present evidence on which a jury could rely to find in his favor. The

email address and Straeter-Stephenson meeting are insufficient.

Bridge insists that at least one avenue for aggregating employees must be open to him, because he has presented evidence enough to satisfy the "integrated enterprise" test—a four-factor test for determining when separate entities may be treated as a single employer under the National Labor Relations Act, *see Naperville Ready Mix, Inc. v. NLRB*, 242 F.3d 744, 751–52 (7th Cir. 2001); *Papa*, 166 F.3d at 942, or, as Bridge argues, under the FMLA, *see* 29 C.F.R. § 825.104(c)(2). In *Papa*, we explained that the legal principles governing affiliate liability "should [not] vary from statute to statute, unless the statute, or the particular policy that animates the statute, ordains a particular test." 166 F.3d at 941. The NLRA calls for the integrated-enterprise test, but that is the exception, not the rule. *Id.* at 941–42. And we need not address today whether the same exception applies to the FMLA, as Bridge asserts no claims under that statute. It has been many years since we dispensed with the integrated-enterprise analysis in ADEA cases, *see id.* at 939–43, and to the extent Bridge asks us to revisit that holding, we decline the invitation.

## III

Bridge did not marshal evidence from which a jury could find that New Holland Logansport was an "employer" under the ADEA. Summary judgment in favor of the defendant was appropriate, and we AFFIRM the judgment of the district court.