In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1106

SHANNON C. PRINCE,

*Plaintiff-Appellant,*

*v.*

APPLETON AUTO, LLC, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-1465 — **Nancy Joseph**, *Magistrate Judge.*

———————————

ARGUED SEPTEMBER 22, 2020 — DECIDED OCTOBER 21, 2020

———————————

Before SYKES, *Chief Judge*, FLAUM, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Defendant-appellee Applecars, LLC is a member of a network of affiliated but corporately distinct used-car dealerships located in Wisconsin. Plaintiff-appellant Shannon Prince worked at Applecars for several months in 2018 before he was fired. Prince claims his firing was retaliatory, and sued Applecars and its affiliates for racial discrimi-

nation under Title VII of the Civil Rights Act of 1964. The district court granted summary judgment to the defendants, noting that Applecars had fewer than fifteen employees and therefore was not subject to Title VII. Because there is insufficient evidence to support Prince's theory that we should pierce the corporate veil of the dealership network, and thereby aggregate the number of employees such that Title VII would apply, we affirm.

## I. Background

Prince worked as a salesman with Applecars, LLC for several months in 2017 until he was fired. Defendants claim he was fired for performance issues, while Prince maintains defendants discriminated against him because of his race.

Applecars operated a used car dealership in Appleton, Wisconsin. The Applecars dealership was affiliated with four other dealerships throughout Wisconsin: Wausau Auto, Antigo Auto, Green Bay Auto, and La Crosse Auto. Each of these dealerships was independently owned by a separate Wisconsin limited liability company. In turn, defendant Robert McCormick owned a majority or outright share in each of these LLCs. Furthermore, each of the dealerships received management services from Capital M, Inc., which McCormick also owned. Applecars alone had fewer than fifteen employees, but if the court were to aggregate all the dealerships, both parties agree they would have had greater than fifteen employees.

The overlap between these companies was substantial. Specifically, Capital M provided management services to each dealership, including marketing, financial, accounting, "visionary," and payroll services; Capital M tracked shared

dealership inventory, held personal employee records, and is-
sued identical employee handbooks for each dealership; and
Capital M's operations manager hired, fired, and promoted
each dealership's general manager. McCormick was the sole
or majority owner of each dealership. The employees of each
dealership gathered as one for events and parties several
times per year.

Beyond these shared functions directed by Capital M, all
the dealerships also advertised on a single website,
www.199ride.com. The landing page marketed the dealer-
ships with some language suggesting a single entity, includ-
ing "Wisconsin's #1 Highest Volume Independent Dealer"
and "We are a dealer for the people." Yet, there were other
clear indicators that each dealership is a separate entity. The
landing page displayed all four dealerships' names, physical
addresses, and phone numbers. Under a "Locations" tab, a
visitor could access a drop-down menu with names of each
dealership linked to their own websites. The bottom of the
landing page included the d/b/a for each dealership as well.

Apart from their intertwined daily operations, each deal-
ership and its LLC owner properly maintained corporate for-
malities and records. Capital M's management services billed
each dealership separately. Each dealership individually paid
for Capital M's management services and for the use of the
199ride.com trademark and website. Each dealership had a
distinct general manager, its own bank accounts, and its own
financial reports. The dealerships also filed and paid their
own taxes, paid their own employees (and issued their own
W-2 forms for their employees), and entered into their own
contracts for business purposes.

In response to his termination, Prince initially filed a Wisconsin state law Administrative Complaint, which he then withdrew in favor of bringing this action in federal court. At his request, the Equal Employment Opportunity Commission issued Prince a Right to Sue letter. Prince brought suit alleging Title VII violations against defendants in the Eastern District of Wisconsin. In the fall of 2019, the parties consented to a magistrate judge's ability to enter final judgment in the case. In December 2019, the magistrate judge granted defendants' motion for summary judgment, finding that Applecars was not liable under Title VII because, with fewer than fifteen employees, it was not an "employer" under the statutory definition. Prince timely appealed.

## II. Discussion

We review this grant of summary judgment de novo, viewing the record and drawing all reasonable inferences in the light most favorable to Prince, the non-moving party. *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Congress exempted small businesses from the strictures of Title VII. The statute only applies to an "employer," which it defines as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). The parties agree that Applecars alone never met the fifteen-employee threshold during the relevant time period; they also agree that if all related dealerships were aggregated, there would be

more than fifteen employees altogether. The dispute therefore rests solely on the question of whether we ought to pierce the dealerships' corporate veils and aggregate the dealerships' employees to render them subject to Title VII.

Fortunately, we have analyzed such a situation before. The leading case is *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999). There, we addressed "what test to use to determine whether an employer that has fewer than 15 … employees, and thus falls below the threshold for coverage by the major federal antidiscrimination laws, … should be deemed covered because it is part of an affiliated group of corporations that has in the aggregate the minimum number of employees." *Id.* at 939 (citations omitted). We noted that the purpose of exempting small businesses from Title VII was not to encourage discrimination by them but rather "to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail." *Id.* at 940. We then laid out three circumstances when the existence of an affiliated company would result in potential liability under Title VII.[1] The instant case only concerns one such ground, on which Prince raises his appeal:

---

[1] In particular, employee aggregation is appropriate "where: (1) the enterprise has purposely divided itself into smaller corporations to dodge requirements imposed by the anti-discrimination laws; (2) a creditor of one corporation could, by piercing the corporate veil, sue its affiliate; or (3) the affiliate directed the discriminatory act or practice of which the plaintiff complains." *Bridge v. New Holland Logansport, Inc.,* 815 F.3d 356, 364 (7th Cir. 2016) (citing *Papa,* 166 F.3d at 940–42).

>The first situation is where, the traditional conditions being present for "piercing the veil" to allow a creditor, voluntary or involuntary, of one corporation to sue a parent or other affiliate, the parent or affiliates of the plaintiff's employer would be liable for the employer's debts. If because of neglect of corporate formalities, or a holding out of the parent as the real party with whom a creditor nominally of a subsidiary is dealing, a parent (or other affiliate) would be liable for the torts or breaches of contract of its subsidiary, it ought equally to be liable for the statutory torts created by federal antidiscrimination law. In such a case the parent by its actions has forfeited its limited liability. This approach is conventional in discrimination cases where the employee of a subsidiary seeks to affix liability on the parent for reasons unrelated to the subsidiary's being within the exemption for employers who have only a few employees.

*Id.* at 940–41 (citations omitted).

Piercing the corporate veil for the purpose of employee aggregation requires a plaintiff show more than a degree of integration of corporate operations. In *Papa*, a consolidated appeal of two discrimination cases, each plaintiff unsuccessfully sought to aggregate employees by piercing the corporate veil. In the first case, we denied veil-piercing, *id.* at 942, even though the subsidiary Walsh Press Company, Inc. had a "degree of integration" with the parent company Katy Industries, Inc, *id.* at 939. Katy fixed the salaries of Walsh employees, pro-

vided pension plans for Walsh employees, funded Walsh, in-
tegrated Walsh's computer operations, provided Walsh with
its own subaccounts within Katy's checking account (in lieu
of Walsh having its own bank account), and required that
Walsh seek its approval for writing checks of more than
$5,000. *Id.* Similarly, in the second case, despite noting a "de-
gree of integration" between GJHSRT, a trucking company,
and Frederick Group of Companies, the affiliated group of
which it was a part, *id.*, we declined to pierce the corporate
veil, *id.* at 942. Among the Frederick affiliates, payroll, bene-
fits, and computer operations were centralized. *Id.* at 939. Ad-
ditionally, the board of directors' membership overlapped be-
tween the two companies and employees moved between af-
filiates. *Id.*

Despite the level of integration in both cases, we found the
facts did not support veil-piercing, in part, because "[f]irms
too tiny to achieve the realizable economies of scale or scope
in their industry will go under unless they can integrate some
of their operations with those of other companies, whether by
contract or by ownership." *Id.* at 942. More to the point:

> Why should it make a difference if the integra-
> tion takes the form instead of common owner-
> ship, so that the tiny employer gets his pension
> plan, his legal and financial advice, and his pay-
> roll function from his parent corporation with-
> out contractual formalities, rather than from in-
> dependent contractors?

> That is all that's involved in the cases before
> us. … There is no showing that an ordinary
> creditor of one of the subsidiaries could pierce

> the corporate veil and sue the parent corpora-
> tion or any of the other subsidiaries.

*Id.*

More recently, in *Bridge v. New Holland Logansport, Inc.*, we reiterated that employee aggregation is appropriate only in certain enumerated circumstances, such as where "a creditor of one corporation could, by piercing the corporate veil, sue its affiliate." 815 F.3d at 364. We emphasized that the test is not whether (or to what extent) corporations are integrated, but rather whether the integration serves to manipulate creditors and thus warrant veil-piercing under relevant state law. *See id.* at 364–65. We therefore considered each entities' operations, integrated or otherwise, only to the extent they bore on the determinative question: whether the two entities "neglected forms intended to protect creditors from being confused about whom they can look to for the payment of their claims." *Id.* at 364 (quoting *Papa*, 166 F.3d at 943).

In deciding whether the number of employees of defendant New Holland Logansport (the plaintiff's former employer) and New Holland Rochester should be aggregated in *Bridge*, we held aggregation was not appropriate because the companies had respected the corporate formalities. We acknowledged that the entities "did do a fair amount of sharing," including sharing similar names, directors, certain employees' services, equipment, manuals, programs to track and access inventory, centralized benefits, and addresses on their tax return. *Id.* at 364. But even though the substantial overlap in their operations "bespeaks a certain degree of integration," it "does not suggest [] a misuse of corporate form," confusing creditors of which company might be liable for a debt. *Id.* The companies had separate invoices, bank accounts, tax returns,

locations, inventories, advertising, and management of operations, falling short of demonstrating that Logansport was a "mere instrumentality or adjunct" of Rochester to warrant piercing the corporate veil. *Id.* at 365. Even their use of a single shared website did not upset this conclusion. Although the website contained specific statements that, in isolation, "impl[ied] that New Holland … was a single company with multiple store locations," the website's language, viewed as a whole, gave the impression that the entities were distinct corporations. *See id.* The website listed physical addresses for each and referred to them as separate companies. Because the "corporate forms were [not] so ignored or manipulated as to perpetrate a fraud on the companies' creditors," we affirmed summary judgment for the employer. *Id.*

Because piercing the corporate veil is governed by state law,[2] we must also look to Wisconsin state law to help us determine whether we ought to pierce the corporate veil. The Wisconsin Supreme Court "recognizes that the corporation is a separate entity and is treated as such under all ordinary circumstances." *Fontana Builders, Inc. v. Assurance Co. of Am.*, 882 N.W.2d 398, 414 (Wis. 2016) (citation and internal quotation marks omitted). "Piercing the corporate veil is appropriate only when applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim." *Id.* (citation and internal quotation marks omitted).

---

[2] We held in *Bridge* that "[v]eil-piercing is governed by state law" and applied Indiana law because both entities were incorporated there." 815 F.3d at 364. The parties here agree that the Wisconsin law on veil-piercing applies.

Having reviewed *Papa*, *Bridge*, and Wisconsin precedent
on the issue, we now turn to the facts at hand. The logic in
*Papa* that it makes sense for affiliated small businesses to share
some operational efficiencies applies to the coordination be-
tween Applecars, the other dealerships, and Capital M. *See*
166 F.3d at 942. Applecars and its related dealerships over-
lapped a great deal in terms of operations, particularly in the
areas of shared services received from Capital M. But we have
already deemed it legitimate to share those services, such as
marketing, financial, accounting, and employee records,
without risking veil-piercing. That McCormick was the sole
or majority owner of the business is not dispositive; indeed,
the fact that other owners held shares in some dealerships but
not others is a textbook reason for such companies to maintain
formal corporate separation, even if they contracted together
for some services. *See id.*

True, the dealerships shared a web address (where they
were advertised and counted together as Wisconsin's largest
independent used car dealership), perhaps weighing in favor
of piercing the veil. But that alone is not enough, particularly
where 199rides.com, much like newhollandrochester.com,
identified the dealerships separately by name and by address,
and importantly, where the companies in question respected
every corporate formality. *See Bridge*, 815 F.3d at 365. The un-
disputed evidence that the dealerships properly kept records
and maintained separate financial accounts overwhelms any
slight doubts brought on by the website. *Id.* ("Though the op-
erations of these two small businesses were in some ways
combined, their identities were separate enough that piercing
the veil between affiliates would be inappropriate here.").

None of the Wisconsin courts' bases for veil-piercing apply either. There is no evidence that respecting the dealerships' corporate forms will allow them to "accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim." *Fontana Builders*, 882 N.W.2d at 414 (citation omitted). Prince tries to argue that it would defeat his own strong equitable Title VII claim, but this is insufficient. As defendants point out, under this logic any Title VII or other federal discrimination complainant could pierce the corporate veil with no evidence whatsoever beyond his own allegations. This is not enough.

Prince cites a Seventh Circuit case, *Parker v. Scheck Mechanical Corp.*, 772 F.3d 502 (7th Cir. 2014), and a Wisconsin Supreme Court case, *Wiebke v. Richardson & Sons, Inc.*, 265 N.W.2d 571 (Wis. 1978), to buttress his argument that Applecars failed to sufficiently separate itself from its affiliates so as to warrant veil-piercing. Neither case controls. In *Parker* we reversed a district court's entry of summary judgment where the plaintiff argued the corporate identities of his employer and an affiliated company were blurred. The evidence indicated that the related companies shared office space, corporate officers, and some operations. *Id.* at 504. The critical difference between *Parker* and the instant appeal (and *Papa* and *Bridge*) is that no discovery had taken place in *Parker* before summary judgment was granted. *Id.* at 507. The *Parker* court held that the plaintiff "d[id] not have overwhelming evidentiary support for the proposition that the line between the two companies is blurred," but allowed the case to revive because the defendants did not meet their initial burden to show no material question of fact. *Id.* By contrast, the parties here have taken discovery and submitted substantial evidence, which

indicates that the dealerships' corporate forms do not improperly overlap.

Nor does *Wiebke* support Prince's contention that this case "truly is one of the rare occasions where a company has organized, controlled and conducted its corporate affairs in such a way that there is no separation between itself and its affiliates." In *Wiebke*, the Wisconsin Supreme Court held that Wiebke, a personal employee of Richardson, could recover a debt owed by Richardson from Richardson's company. 265 N.W.2d at 572. Wiebke had loaned $6,000 in exchange for a promissory note signed by Richardson in his individual capacity. *Id.* At that time, Richardson was also the president and sole shareholder of his company. *Id.* Richardson deposited Wiebke's check into the corporation's account. *Id.* at 573. He claimed that, because he did not have a personal checking account, he would draw checks on the corporation's account to pay personal expenses. *Id.* When Richardson defaulted on the loan, the corporation, not Richardson, paid Wiebke an interest payment in the form of a corporate check that was displayed on corporate records as a corporate expense. *Id.* The debt remained unpaid. *Id.*

The court held that this messy commingling of personal and corporate funds invited it to pierce the corporate veil. "Richardson failed to draw the line between his individual and corporate affairs and is in a poor position to ask the court to do so." *Id.* at 574. The facts of this case demonstrate what is lacking in Prince's complaint: any suggestion that the dealerships failed to properly maintain their corporate personhood, records, or funds.

As we wrote in *Papa*, it is "nonsense" to suggest that a corporate group must erect firewalls among its affiliates or else

risk Title VII liability. 166 F.3d at 943. "The corporate veil is pierced, when it is pierced, not because the corporate group is integrated … but (in the most common case) because it has neglected forms intended to protect creditors from being confused about whom they can look to for the payment of their claims." *Id.* (citations omitted). Here, there is no evidence the defendants neglected corporate forms or risked confusing creditors. While substantially integrated, the dealerships properly maintained separate accounts, identities, and corporate records. In this case, there is no basis to pierce the corporate veil.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.