In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1473

LOU MAZZEI, TRUSTEE OF THE LOCAL 786
BUILDING MATERIAL TEAMSTERS AND
HELPERS WELFARE FUND AND LOCAL 786
BUILDING MATERIAL TEAMSTERS AND
HELPERS PENSION FUND,

Plaintiff-Appellant,

v.

ROCK-N-AROUND TRUCKING, INC.,
an Illinois corporation,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 1975--David H. Coar, Judge.


Argued October 27, 2000--Decided April 6, 2001



   Before Easterbrook, Kanne, and Rovner, Circuit
Judges.

   Kanne, Circuit Judge.  Lou Mazzei, Trustee of the
Local 786 Building Material Teamsters and Helpers
Welfare Fund and Local 786 Building Material
Teamsters and Helpers Pension Fund ("the Funds"),
filed suit against Rock N' Around Trucking
("RNA"), claiming that pursuant to the terms of
the collective bargaining agreement (the "CBA")
RNA entered into with the International
Brotherhood of Teamsters, Local 786 ("Local
786"), RNA owes the Funds $669,030 in
contributions on behalf of its owner-drivers. The
district court found that the CBA obligates RNA
to contribute to the Funds on behalf of its
owner-drivers. The court concluded, however, that
such contributions would violate section 302 of
the Labor Management Relations Act ("LMRA"), 29
U.S.C. sec. 186, because RNA's owner-drivers are
independent contractors. Therefore, the court
granted RNA's motion for summary judgment. Mazzei
now appeals the district court's decision.
Because we agree with the district court's
conclusion that the contributions called for in
the CBA are illegal under section 302 of the
LMRA, we affirm its decision granting RNA's
motion for summary judgment.

I.  History

  RNA is an Illinois Corporation that provides
trucking services to the construction industry.
In April 1996, RNA entered into the CBA with the
Local 786, a labor union representing truck
drivers and yard employees engaged in the
processing and delivery of building materials.
The controversy in this case centers around what
obligation, if any, RNA has, under the terms of
the CBA, to contribute to the Funds on behalf of
its owner-drivers, those individuals who own and
drive their own trucks.

  Most of RNA's hauling operations are performed
by owner-drivers. These individuals sign
"Equipment Leases" with RNA and operate under
RNA's license to operate as a motor carrier./1
The lease term is for three years, though either
party may terminate the lease at any time without
penalty. Additionally, owner-drivers are free to
lease their services to other carriers during
this term, and they can refuse to work for RNA
for any reason. Owner-drivers working for RNA
store and maintain their own trucks, pay for
their own gas, pay their own taxes, and provide
their own insurance coverage. With regard to
compensation, owner-drivers are paid on a Form
1099 basis and receive a gross percentage of the
payments RNA receives from its customers, rather
than an hourly wage.

  An owner-driver who accepts an assignment from
RNA is told the location and time of the pick-up
and/or delivery of his or her respective load.
When an owner-driver accepts an assignment from
RNA, that owner-driver is required by Illinois
law to place a sign on the side of the truck cab
that reads: "Leased To & Operated By Rock N'
Around Trucking, Inc." This sign must be covered
up or removed, however, whenever an owner-driver
is not performing work for RNA under RNA's ILCC
license; and owner-drivers must return these
signs along with all other RNA materials at the
end of a lease term.

  The Funds are multiemployer benefit plans as
defined in 29 U.S.C. sec. 1003(37)(A), and
therefore, they are governed by the Employee
Retirement Income Security Act of 1974 ("ERISA").
29 U.S.C. sec. 1003(a). In the course of auditing
employers contributing to the Funds, Local 786
concluded that RNA owed $669,030 in delinquent
contributions on behalf of its owner-drivers.
Mazzei, a Trustee of the Funds, filed suit in the
Northern District of Illinois pursuant to section
502 of ERISA, 29 U.S.C. sec. 1132, alleging that
RNA violated section 515 of ERISA, 29 U.S.C. sec.
1145, by failing to make contributions required

by the CBA on behalf of its owner-drivers. RNA disputed Mazzei's claim, advancing three reasons why it should not be required to make these contributions: (1) the contract language is ambiguous and does not require contributions; (2) the owner-drivers signed waivers of contributions, and thus, none are required; and (3) the owner-operators are independent contractors and not employees, thereby making the contributions illegal. The parties filed cross-motions for summary judgment. The district court granted RNA's motion, finding that although the CBA unambiguously obligates RNA to contribute to the Funds for each of its owner-drivers, the form of contribution called for in the CBA is illegal under section 302 of the LMRA because RNA's owner-drivers are independent contractors. 29 U.S.C. sec. 186. Mazzei now appeals the court's decision, challenging its determination that the owner-drivers are independent contractors instead of employees and its conclusion that the contributions called for in the CBA violate federal law.

II.  Analysis
A.  Standard of Review

   We review the district court's decision to grant RNA's motion for summary judgment de novo. See Contreras v. Suncast Corp., 237 F.3d 756, 759 (7th Cir. 2001). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue of material fact exists, and summary judgment is improper, if a reasonable jury could return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In making this determination, we review the record in the light most favorable to the non-moving party, in this case Mazzei, drawing all reasonable inferences in his favor. See Amadio v. Ford Motor Co., 238 F.3d 919, 921 (7th Cir. 2001); see also Liberty Lobby, Inc., 477 U.S. at 255.

B.  RNA's Obligation to Contribute
 Under the CBA

   Mazzei alleges that RNA's failure to contribute to the Funds on behalf of its owner-drivers violates the terms of the CBA and section 515 of ERISA. Section 515 "requires employers to comply with the terms of their agreements to make

contributions to funds," Cent. States, Southeast & Southwest Areas Pension Fund v. Transp. Inc., 183 F.3d 623, 627 (7th Cir. 1999), to the extent that such terms are not inconsistent with the law./2 See Cent. States, Southeast & Southwest Areas Pension Fund v. Hartlage Truck Serv., Inc., 991 F.2d 1357, 1360 (7th Cir. 1993). Thus, we must first review the language of the CBA and determine whether it obligates RNA to contribute to the Funds on behalf of its owner-drivers. See Ill. Conference of Teamsters & Employers Welfare Fund v. Mrowicki, 44 F.3d 451, 458 (7th Cir. 1994).

The district court found that the terms of the CBA unambiguously obligates RNA to contribute to the Funds on behalf of its owner-drivers. See Mazzei v. Rock-N-Around Trucking, Inc., No. 99 C 1975, 2000 WL 152137, *3-5 (N.D. Ill. Feb. 4, 2000). RNA disputes the district court's finding with respect to this issue. Instead, RNA contends that the CBA unambiguously establishes that RNA does not have to contribute to the Funds on behalf of its owner-drivers.

We review the district court's interpretation of the CBA de novo. See Cent. States, Southeast & Southwest Areas Pension Fund v. Kroger Co., 226 F.3d 903, 910 (7th Cir. 2000). We will enforce the terms of a collective bargaining agreement if those terms are unambiguous. See Young v. N. Drury Lane Prod., 80 F.3d 203, 205 (7th Cir. 1996). The CBA is unambiguous if it "is susceptible to only one reasonable interpretation." Moriarty v. Svec, 164 F.3d 323, 330 (7th Cir. 1998). Furthermore, if we find no ambiguity in the terms of the CBA, then, in determining its meaning as a matter of law, we need not review extrinsic evidence suggesting how those terms should be interpreted. See Mrowicki, 44 F.3d at 459.

Article 16 of the CBA, entitled "Health and Welfare and Pension," obligates RNA to contribute "into a trust . . . for the payment of Health and Welfare or Pension benefits . . . for an employee covered by this Agreement." In Article 1, "employee" is defined as "the employee or employees in the classifications of work covered" by the CBA. While this definition does not address whether RNA's owner-drivers are considered covered employees, Article 24, entitled "Owner-Drivers," explains that "Owner-Drivers operating their own vehicles and who are not certified carriers with proper Illinois Commerce Commission authority are covered within the terms and conditions of this Agreement, including Union security, hours, wages, overtime, Health & Welfare and Pension and working conditions." CBA sec. 24.1 (emphasis added).

Article 24 clearly extends RNA's responsibilities under Article 16, Health and Welfare or Pension, to the terms of employment for RNA's owner-drivers. Therefore, we find that there can be no mistaking the fact that the CBA attempts to impose an obligation on RNA to contribute to the Funds for each of its owner-drivers.

Furthermore, we agree with the district court's determination that this interpretation of the CBA is "straightforward and not inconsistent with other provisions therein." Mazzei, 2000 WL 152137, at *5. RNA disagrees, arguing that sections 24.1-4 and 24.3 conflict with our interpretation and demonstrate that the terms of the CBA do not obligate it to contribute to the Funds on behalf of its non-certified owner-drivers. Section 24.1-4 explains that non-certified owner-drivers, the group of individuals at issue in this case

shall receive the full wages, supplemental allowance, and all working conditions provided in this Agreement and shall receive as a minimum salary after payment of all direct and indirect operating expenses (including contributions to the Health & Welfare Fund and Pension Fund) the sum equal to the amount he would have received for the time he would have worked as an hourly or percentage rated driver.

CBA sec. 24.1-4. This provision concerns the income of the owner-drivers and tells us nothing about who must contribute to the Funds. Thus, it is not in tension with our finding that 24.1 places the obligation to contribute to the Funds on RNA. Section 24.3, which addresses the terms of employment for a different group of drivers than the owner-drivers at issue in this case, states that

[c]ompanies who hire owner operators who are members of the Union and are Certified Carriers with proper Illinois Commerce Commission authority and who drive their own trucks and perform work exclusively for the Employer shall be covered by Article 16- Health & Welfare and Pension and it shall be the Employer's responsibility to make contributions on their behalf.

CBA sec. 24.3. RNA contends that the use of such specific language in defining its duty with respect to the certified owner-operators, in contrast with the lack of such language in section 24.1, is a clear indication that RNA has no such duty with respect to the owner-drivers at issue in this case. We do not agree. While section 24.3 can be read to be a more specific explanation of RNA's obligation to contribute

than section 24.1, it does not contradict or detract from the clear directive of 24.1 incorporating RNA's obligations under Article 16 into the terms of employment for the non-certified owner-drivers at issue in this case. Thus, we agree with the district court's conclusion that the CBA unambiguously requires RNA to contribute to the Funds on behalf of its owner-drivers.

C. Legality of the Contributions Called for in the CBA

Having found that the CBA obligates RNA to contribute to the Funds on behalf of its owner-drivers, we must now evaluate the legality of these contributions under the LMRA. When Congress was formulating the LMRA, it was concerned "with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." Arroyo v. United States, 359 U.S. 419, 425-26, 79 S. Ct. 864, 3 L. Ed. 2d 915 (1959). To address these concerns, Congress included section 302(a)(1) of the LMRA, which prohibits employers from paying "any representative of any of his employees." 29 U.S.C. sec. 186(a)(1). However, because Congress had to balance its fears of misuse and bribery with organized labor's demand for a system of employee welfare funds financed by employer contributions and administered by union officials, see Arroyo, 359 U.S. at 426, the LMRA provides an exception to this prohibition "with respect to money . . . paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer." 29 U.S.C. sec. 186(c)(5). This exception is limited, however, as it does not allow an employer to contribute to a trust fund "on behalf of," or "for the benefit of," individuals that are not employees of the contributing employer. See Ill. Conference of Teamsters & Employers Welfare Fund v. Mrowicki, 44 F.3d 451, 460 (7th Cir. 1995) (citing Walsh v. Schlecht, 429 U.S. 401, 407, 97 S. Ct. 679, 50 L. Ed. 2d 641 (1977)). Nevertheless, in Walsh v. Schlecht, 429 U.S. at 407, the Supreme Court held that the LMRA permits employer trust fund contributions, regardless of the employment status of the employer's workers, when the amounts of such contributions are measured by the number of hours worked by that employer's workers as opposed to being given simply "on behalf of" or "for the benefit of" the employer's workers. Id.; see also Mrowicki, 44 F.3d at 461 (citing Walsh, 429 U.S. at 407-10) ("[A] clause in a collective bargaining agreement making an

employer liable for payment of trust fund contributions based on the hours worked at a job site by individuals other than its own employees [does] not violate sec. 302 of the LMRA."); Todd v. Benal Concrete Constr. Co., 710 F.2d 581, 583 (9th Cir. 1983) (explaining that in Walsh the Court "held that contributions may reflect work performed by employees of . . . independent subcontractors, but only if the amounts are 'measured by' the number of hours worked"). Therefore, we will first examine the manner in which the CBA requires RNA to contribute to the Funds to determine if such contributions are permissible regardless of the employment status of RNA's owner-drivers.

Section 16.1 of the CBA obligates RNA to contribute fixed weekly amounts, set out in section 16.2, to a trust "for the payment of Health and Welfare or Pension benefits . . . for an employee covered by this Agreement, in accordance with the requirements set forth in the appropriate Appendix of this Article." Appendix A of the CBA, entitled "Health and Welfare," explains that RNA is required to contribute the amounts called for in section 16.2 to the Welfare Fund "for each employee covered by this Agreement who performs work on any two calendar days in any calendar week, regardless of the number of hours worked." CBA App. A (emphasis added). Similarly, Appendix B, entitled "Pension," requires RNA to contribute to the Pension Fund according to the schedule in section 16.2 "for each employee who performs work on any two days in any calendar week, regardless of the number of hours worked." CBA App. B (emphasis added). Thus, RNA's contributions are to be made "for each employee" when that employee works at least two days of a work week. The measure of these contributions has no relation to the number of hours these individuals actually work, however, as the amounts are provided for in the CBA. Therefore, this type of contribution is not like the employer contributions the Supreme Court found to be permissible under the LMRA in Walsh, which were based on the number of hours worked by the employer's workers. See Walsh, 429 U.S. at 407-10.

Because the contributions RNA is required to make under the terms of the CBA are "for each employee," and not like those upheld in Walsh, the employment status of RNA's owner-drivers will determine the legality of the contributions under the LMRA. As previously mentioned, employer payments to a trust for the exclusive benefit of that employer's employees are permissible under the LMRA. 29 U.S.C. sec. 186(c)(5). Thus, if RNA's owner-drivers are employees of RNA, the contributions would fall under this exception and

be permissible under the LMRA. If the owner-drivers are independent contractors, however, because the LMRA "excludes any person having the status of independent contractor from the statutory definition of 'employee,'" Mrowicki, 44 F.3d at 460, then any RNA contribution to the Funds on behalf of the owner-drivers would violate section 302 of the LMRA. Thus, we must determine whether these owner-drivers are employees of RNA.

D.  The Employment Status
 of RNA's Owner-Drivers

   In Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992), the Supreme Court adopted "a common-law test for determining who qualifies as an 'employee' under ERISA." Id. at 323. While the Court listed twelve factors to be considered when making this determination, it noted that the common law test had "no shorthand formula or magic phrase that can be applied to find the answer," and that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Id. at 324 (citations omitted). Prior to the Court's decision in Darden, we applied our own five factor analysis to determine an individual's employment status. See Knight v. United Farm Bureau Mut. Ins., 950 F.2d 377, 378-79 (7th Cir. 1991). Like the Supreme Court's approach in Darden, our analysis recognizes that "'[o]f several factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor.'" Compare EEOC v. N. Knox Sch. Corp., 154 F.3d 744, 747 (7th Cir. 1998) (quoting Knight, 950 F.2d at 378) with Darden, 503 U.S. at 323 ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.") (citations omitted). Since Darden, we have concluded that the factors described by the Court in that decision are adequately subsumed within our five-factor analysis. See Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 492 n.1 (7th Cir. 1996). Therefore, we will determine the employment status of RNA's owner-drivers within the framework of our Knight analysis.

   In evaluating the employment status of RNA's owner-drivers, we must examine the following factors:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the

kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

Knight, 950 F.2d at 378-79. When a district court uses our five-factor analysis to determine an individual's employment status, we review that court's factual determinations for clear error. See Aberman v. J. Abouchar & Sons, Inc., 160 F.3d 1148, 1150 (7th Cir. 1998); see also Ost v. W. Suburban Travelers Limousine, 88 F.3d 435, 438 (7th Cir. 1996). Because our analysis subsumes the factors set out in Darden, see N. Knox Sch. Corp., 154 F.3d at 747, we will also review the factual determinations made by the district court using the Supreme Court's approach in Darden for clear error.

Applying the first factor of our analysis, "the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work," it is clear that RNA exerted very little control or supervision over its owner-drivers. Mazzei disagrees, contending that RNA's ability to tell owner-drivers where and when to pick up and/or deliver a load of materials is an indication of significant control. Although Mazzei accurately describes RNA's ability to instruct owner-drivers who accept an assignment from RNA, the control RNA exercises over its owner-drivers amounts to little more than the basic level of supervision required to ensure that the arrangement between RNA and its owner-drivers is of some value to RNA. Additionally, other facts further exhibit the minimal amount of control RNA exercises over its owner-drivers. First, these individuals own and drive their own trucks. Second, although owner-drivers sign a lease with RNA for a period of three years, they can refuse to work for RNA at any time and for any reason, they can work for other companies at any time, and they can terminate the lease with RNA at any time and for any reason without penalty. In this respect, RNA's owner-drivers are similar to the limousine drivers that we found to be independent contractors in Ost v. W. Suburban Travelers Limousine, 88 F.3d 435 (7th Cir. 1996). The drivers in Ost, like RNA's owner-drivers, "supplied their own vehicles," and "were able to choose to work whatever days they preferred, . . . were free to refuse any assignments they wished . . . and could work for dispatching services other than West Suburban." Id. at 438. We held that "each of these facts indicates that the

manner in which the drivers performed their services for West Suburban was primarily within their own control." Id. Thus, the control RNA exercises over its owner-drivers, or the lack thereof, is consistent with that found in an employer-independent contractor relationship.

We have found that the second factor, "the kind of occupation and nature of skill required, including whether skills are obtained in the workplace," favors "a finding of neither independent contractor nor employee" when dealing with individuals similar to RNA's owner-drivers "because professional drivers . . . could be either employees or independent contractors." N. Knox Sch. Corp., 154 F.3d at 749.

In terms of our third factor, "responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations," the facts of this case indicate that RNA's owner-drivers are independent contractors. In addition to owning and driving their own trucks, owner-drivers provide storage for their trucks, are responsible for the maintenance of their trucks, pay for their own gas, and pay for their trucks to be insured.  RNA's owner-drivers are in this respect, therefore, very much like the school bus drivers we found to be independent contractors in North Knox School Corp., 154 F.3d at 751. The bus drivers in North Knox, like RNA's owner-drivers, "were required to supply their own buses and absorb all costs such as insurance and maintenance." Id. at 749. We found these facts to be "a strong indication that the drivers were independent contractors." Id.

The fourth factor of our analysis, "the method and form of payment and benefits," also suggests that RNA's owner-drivers are independent contractors. The owner-drivers are paid on a Form 1099 basis, which Mazzei acknowledges in his brief is designated as non-employee compensation, and which we have held "would be appropriate for independent contractors." N. Knox Sch. Corp., 154 F.3d at 750. Additionally, the owner-drivers pay their own taxes and receive a gross percentage of the money paid to RNA by its clients as opposed to receiving an hourly wage.

Finally, "the length of job commitment and/or expectations," also implies that RNA's owner-drivers are independent contractors. As we mentioned earlier in examining the extent of RNA's control over its owner-drivers, these individuals each sign an Equipment Lease with RNA for a period of three years. However, being able to: (1) cancel the lease at any time and for any reason without penalty; (2) work whenever he or

she wants; and (3) work for whomever he or she wants, can hardly be characterized as the type of commitment consistent with that of an employer-employee relationship.

In arguing that the owner-drivers are employees, Mazzei draws our attention to several sections of the CBA that treat the owner-drivers as employees of RNA. Specifically, Mazzei points to language in the contract stating that RNA's owner-drivers are to receive overtime, vacation, and holiday pay, and that they will have set starting times and hours of work. Mazzei contends that independent contractors do not receive these types of benefits, and that these factors, combined with RNA's ability to instruct those owner-drivers who accept assignments from RNA, demonstrate that the owner-drivers are employees. We find this argument to be unpersuasive. "Contractual language alone cannot transform a contractor/independent contractor relationship into an employer/employee relationship." Todd v. Benal Concrete Constr. Co., 710 F.2d 581, 584 (9th Cir. 1983). To determine the employment status of an individual or group, we must, as we have in this case, evaluate the actual employment relationship. We have already explained that the control exercised by RNA over its owner-drivers is minimal. Additionally, Mazzei presents no evidence that RNA's owner-drivers have received any of the payments mentioned in the sections of the CBA he asks us to review. Without more, and based on our above analysis, we conclude that the owner-drivers working for RNA are independent contractors

Given our determination that RNA's owner-drivers are independent contractors, the present case bares a striking similarity to the Ninth Circuit's decision in Todd v. Benal Concrete Construction Co., 710 F.2d 581. In Benal, the terms of a collective bargaining agreement explained that when individuals referred to as owner-operators performed work for Benal that was covered by the terms of the agreement, those individuals "shall become employees." Id. at 582. The practical effect of this language was that Benal would thereafter be obligated to contribute "on behalf of" these owner-operators to local union trust funds. Reviewing not only the language of the contract, but also the actual working relationship between Benal and the owner-operators, the court determined that the owner-operators were independent contractors. Because the contributions Benal was obligated to make were not based on the hours worked by these non-employees, like the contributions upheld in Walsh, but instead were to be made "on behalf of" the owner-operators, the court concluded that Benal could not be required to make these

contributions, as they would violate section 302 of the LMRA. See id. at 584.

Like Benal, RNA cannot be required to contribute to the Funds for each of the owner-drivers, whom we have determined are independent contractors, when those contributions are not based on the number of hours worked. Therefore, we agree with the district court's conclusion that while the terms of the CBA require RNA to contribute to the Funds on behalf of its owner-drivers, the manner in which these contributions are called for violates the LMRA because the owner-drivers are independent contractors.

III.  Conclusion

For the reasons stated above, we AFFIRM the district court's decision to grant RNA's motion for summary judgment.

/1 RNA is licensed by the Illinois Commerce Commission (the "ILCC') to operate as a motor carrier. Some of RNA's owner-drivers obtain their own licenses from the Illinois Commerce Commission. These owner-drivers operate under their own licenses and do not sign leases with RNA. The disputed contributions in this case, however, deal only with those "non-certified" owner-drivers working for RNA, and therefore, our references to owner-drivers only include non-certified owner-drivers.

/2 Section 515 states:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. sec. 1145.