In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 17-2267

BOGUSTAWA FREY,

*Plaintiff-Appellant,*

*v.*

HOTEL COLEMAN, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-06284 — **John J. Tharp, Jr.**, *Judge.*

———————————

ARGUED MAY 23, 2018 — DECIDED SEPTEMBER 11, 2018

———————————

Before WOOD, *Chief Judge*, and BAUER and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Before we can attend to any other issues in an employment discrimination case, we must first determine who, in fact, employed the plaintiff. This question, which seems as though it ought to be simple on its face, continues to confound litigants and courts. This case presents issues regarding the employer/employee relationship that arise in the not-so-uncommon scenario where one employer hires

another entity to manage the day-to-day operations of an enterprise. In such a case, one entity provides the paycheck but another entity does all of the other tasks one ordinarily associates with an employer—hiring, firing, training, supervising, evaluating, assigning, et cetera.

## I.

In this case, Hotel Coleman, Inc. owned a Holiday Inn Express franchise in Algonquin, Illinois (the Hotel). Hotel Coleman hired Vaughn Hospitality, Inc. to run the daily operations of the Hotel. According to the terms of the hotel management agreement between the two entities, Vaughn Hospitality was responsible for hiring, supervising, directing, and discharging employees, and determining the compensation, benefits and terms and conditions of their employment. Hotel Coleman agreed that it would "not give direct instructions to any employee of [Hotel Coleman] or to [Vaughn Hospitality] employees whose instructions may interfere, undermine, conflict with or affect in any manner the authority and chain of command as established by [Vaughn Hospitality]." R. 92-2 at 5 (Page ID 1533). Frey and the other staff members who worked at the Hotel were on Hotel Coleman's payroll, and the management agreement stated that all personnel "are in the employ of" the Hotel. R. 92-2 at 2 (Page ID 1529). Michael Vaughn (Vaughn) and his wife owned Vaughn Hospitality. Michael Vaughn served as its president and was the only person on its payroll with the exception of a bookkeeper who worked for eight weeks in 2008 and sixteen weeks in 2009. Other than the hotel management agreement between the two entities, there was no affiliation between Vaughn Hospitality and Hotel Coleman. They were distinct and unrelated legal entities that maintained separate financial records, filed

separate tax returns, and did not share bank accounts or common ownership. *Frey v. Intercontinental Hotels Grp. Res., Inc.*, No. 12 CV 06284, 2015 WL 5921580, at *2 (N.D. Ill. Oct. 9, 2015); R. 97 at 3 (Page ID 1987) (hereinafter *Frey, (employer decision*)); See also R. 71 at ¶9 (Page ID 869).

Vaughn hired the plaintiff, Bogustawa Frey, in August 2008, to work in the Hotel's guest services department. Frey alleged that, shortly after Vaughn hired her, he began to subject her to unwelcome and inappropriate sexual comments and advances. Because this is an appeal of a ruling on summary judgment that Vaughn Hospitality was not Frey's employer, and a jury verdict for Frey on a retaliation claim, we report Frey's allegations and the remaining facts in the light most favorable to Frey and in a manner that is consistent with the jury verdict. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015) (facts on summary judgment must be taken in the light most favorable to the non-moving party); *Tart v. Ill. Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004) ("Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed under the verdict.")

According to Frey, Vaughn subjected her to comments such as the following: he could have any woman he wanted; she should put a penny in a jar every time she had sex with her husband; she had a sexy body. He also asked her if he could touch her stomach, invited her to join him in a hotel room, and told her he wanted to have phone sex with her. *Frey v. Hotel Coleman*, No. 12 CV 06284, 2017 WL 2215013, at *1 (N.D. Ill. May 18, 2017) (hereinafter *Frey (damages decision*)); R. 162 at 2 (Page ID 2515). Frey objected to the comments and complained to the housekeeping manager, but when that

manager informed Vaughn, he laughed off the complaints and the behavior went unchecked.

After Frey informed Vaughn that she was pregnant (in June 2009), Vaughn reduced her hours on the schedule, rescinded a promise he had made to promote her to a sales manager position with a much higher salary, assigned her to work the night shift without paying her the extra amount normally associated with that position, failed to consider her for a front desk position which would have paid an additional $3 per hour, and asked her to perform duties that she complained were difficult for her due to her pregnancy. He also told her that her pregnancy would ruin her sexy body and that her sex life with her husband was over. *Frey* (*damages decision*), 2017 WL 2215013, at *1–2; R. 162 at 2–3 (Page ID 2515–16). During Frey's maternity leave, which began in March 2010, she filed a charge with the Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights based on Vaughn's conduct. One week after she returned from maternity leave, Vaughn fired her for allegedly stealing another employee's cell phone. Frey filed a claim of retaliatory discharge with the EEOC and the Illinois Department of Human Rights against the Hotel, Holiday Inn Express, Vaughn Hospitality, Michael Vaughn and another Hotel employee.

Hotel Coleman sold the Hotel in August 2010, and the new owners did not retain Vaughn Hospitality to manage the Hotel. Two employees who worked in guest services or at the Hotel's front desk continued working for the Hotel, but both left within a year.

Frey filed a claim in the Circuit Court of Cook County pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e et. seq., and the Illinois Human Rights Act, 775 ILCS § 5/1-101 et. seq., alleging sexual harassment, hostile work environment, pregnancy discrimination, and retaliatory discharge against the Holiday Inn Express, Intercontinental Hotels Group Resources, Inc., Hotel Coleman, and Vaughn Hospitality. Intercontinental Hotels successfully removed the case to federal court, and then successfully moved to be dismissed from the case.

In the federal district court, Frey moved for summary judgment against Hotel Coleman as to all counts and Vaughn Hospitality moved for summary judgment asserting that it was not an employer as defined under Title VII and the Illinois Human Rights Act. The district court granted Frey's motion against Hotel Coleman in full.[1] The court, accepting Vaughn Hospitality's argument that it was not an employer, granted it summary judgment with respect to Frey's sexual harassment and pregnancy discrimination claims and her retaliation claim under Title VII, but allowed Frey's state claim for retaliation to proceed. Under the Illinois Human Rights Act, a retaliation claim does not require an employer/employee relationship between the plaintiff and defendant. 775 ILCS § 5/6-101(A).

---

[1] Hotel Coleman failed to respond adequately to Frey's requests for admissions of fact and therefore the district court deemed those facts admitted. Thereafter, finding no issue of material fact with respect to Frey's claims against Hotel Coleman, the district court granted summary judgment against Hotel Coleman on all counts. *Frey v. Hotel Coleman*, 141 F. Supp. 3d 873, 879 (N.D. Ill. 2015) (hereinafter *Frey* (*Hotel Coleman decision*)); R. 96 at 4 (Page ID 1974).

The case then advanced to trial on Frey's claim under the Illinois Human Rights Act that Vaughn Hospitality had retaliated against her for filing a charge of discrimination. The jury found in favor of Frey and awarded her $45,000 in compensatory damages, and the district court awarded her $13,520 in back pay damages—the amount she had claimed in the Joint Pre-trial Memorandum. The district court also awarded prejudgment interest at the average prime rate from May 2010 to May 2017, compounded monthly for a total judgment on Frey's IHRA retaliatory discharge claim of $73,699.51 for which Hotel Coleman and Vaughn Hospitality are jointly and severally liable. The district court also entered judgment against Hotel Coleman for $142,930.51.

On appeal, Frey challenges the district court's conclusion on summary judgment that Vaughn Hospitality was not Frey's employer—a ruling we review de novo. *Smith v. Castaways Family Diner*, 453 F.3d 971, 975 (7th Cir. 2006). Frey also challenges the amount of the district court's award of back pay and prejudgment interest, both of which lie within a district court's discretion and can be overturned only where that discretion has been abused. *First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999).

## II.

## A. Was Vaughn Hospitality Frey's employer?

On appeal, Frey asks us to find that the district court erred in determining that Vaughn Hospitality was not Frey's employer. It is undisputed that Hotel Coleman employed Frey. It signed and funded her paychecks, issued her a W-2 for each year of employment, and owned the Hotel where she worked. For Title VII purposes, however, a plaintiff can have more

than one employer. *Love*, 779 F.3d at 701. Given the complexities of Title VII, it is easy to get sidetracked down the incorrect path of the Title VII maze when looking at employer/employee relationships.

The place to begin when evaluating the existence vel non of a joint employment relationship is *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991). *Knight* instructs that a court in this circuit must employ an "economic realities" test which is, in its essence, an application of general principles of agency law to the facts of the case. *Id.* at 378; *Love*, 779 F.3d at 702. In doing so, a court must consider the following:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Knight*, 950 F.2d at 378–79. Of these factors, "the employer's right to control is the most important," and a court must give it the most weight. *Id.* at 378.

Although the *Knight* test began as a way to differentiate between employees and independent contractors, it soon came to be used in this circuit to determine which entity or entities should be considered to be an employer for purposes

of Title VII liability where there was more than one putative employer. See, e.g., *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017) (using *Knight* test to consider whether a client of an inspection and quality control company for whom the plaintiff provided services was a joint employer for purposes of Title VII); *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 361 (7th Cir. 2016) (using *Knight* test to determine whether commonly-owned entities could be considered joint employers for the purposes of counting employees for Title VII coverage); *Love*, 779 F.3d at 702 (applying *Knight* factors to determine whether contractor or subcontractor or both were plaintiff's employer for Title VII purposes). And we know our case law is on the right track because the Supreme Court has articulated a similar test for determining whether an employer-employee relationship exists for purposes of ERISA—a statute which contains the same definition of "employee" as Title VII. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992). We have held that our *Knight* five-factor test is the essential equivalent of the Supreme Court's *Darden* test. *Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001).

As we explore later, there are different tests a court might rely on to determine if a particular entity is an employer for Title VII purposes in other scenarios—for example, if a corporate veil between related business entities should be pierced because of the actions of those entities, or to determine if certain managers and supervisors are employees or employers for purposes of determining if a business has met the fifteen-employee threshold—but none of these tests applies here. Instead, we have before us two otherwise unrelated business entities—one owns a hotel and the other manages the employees of that hotel—and we must determine whether one,

the other, or both qualify as Frey's employer for purposes of Title VII. In this case, the parties agree that Hotel Coleman was an employer of Frey. The only question then is whether Vaughn Hospitality was as well. For such a task a court must employ the five-factor test set forth in *Knight*. The district court erred by not doing so.

Instead of looking to the *Knight* factors, the district court became distracted by our holding in *Smith v. Castaways Family Diner*, 453 F.3d 971 (7th Cir. 2006). In *Smith* we were called upon to count heads to determine whether the employer, Castaways Diner, had fifteen or more employees. In order for a business to fall within the scope of Title VII, it must employ a minimum of fifteen employees for at least twenty weeks during the calendar year. 42 U.S.C. § 2000e(b). The Illinois Human Rights Act requires the same. 775 ILCS § 5/2-101(B)(1)(a). The *Smith* case required the court to determine whether two managers of the diner should be counted as employees or as employers. Those managers had the absolute power to hire, discipline, and fire the other workers without securing the owner's approval. *Smith*, 453 F.3d at 978. They managed all aspects of the day-to-day operations, including establishing policies, setting their own hours, creating the menu, ordering supplies, and bookkeeping. *Id.* The managers, however, did not own any part of the business and retained authority only by delegation from the owner. Had she changed her mind and reassumed those responsibilities, the managers would have had no recourse. *Id.* at 984. The panel in *Smith* looked at various tests courts have used to determine whether any individual is an employee of the sued entity. In one line of case law to which the district court looked, courts distinguish independent contractors from employees. *Darden*, 503 U.S. at 322–24. In another, courts differentiate between owners or

partners of a business with meaningful authority to run the business (who can be classified as employers) and nominal owners and partners who have no such meaningful authority and thus are employees. *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 449–51 (2003) (enunciating a test to determine whether a shareholder-director is an employee). And this court uses yet another test to determine whether we can aggregate employees (to reach the fifteen-employee minimum) where an employer is affiliated with other corporations. *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 939 (7th Cir. 1999). The *Smith* court rejected the *Darden* and *Clackamus*-derived tests as not well-suited to the situation at issue in the case before it—where managers who have no office or equity in the business had near total managerial discretion merely by delegation from someone who did have both the office and equity. *Smith,* 453 F.3d at 976–79. In other words, when evaluating whether a particular worker is an employee or an employer, the status and role of the person in question matters when selecting the appropriate lens or test with which to view the question. The *Smith* court stated that, "Given that [the managers] have no apparent ownership interest or office in Castaways, the test that the Supreme Court and the EEOC have articulated for owners, partners, directors and the like would seem to be inapposite." *Id.* at 981. Likewise, the court noted that the defendants did not need to show that the managers were "*independent contractors* rather than employees … [it needed] to show that they exercise so much authority as to be *employers* rather than employees." *Id.* at 976 (emphasis in original). In *Smith*, the managers held authority only by delegation and acquiescence of the owner. In other words,

> [d]etermining whether an individual controls or
> has the right to control an enterprise, and thus

constitutes an employer, must take into account not only the authority that person wields within the enterprise but also the source of that authority. Specifically, a court must consider whether the *individual* exercises the authority by right, or whether he exercises it by delegation at the pleasure of others who ultimately do possess the right to control the enterprise.

*Smith*, 453 F.3d at 984 (emphasis ours).

And therein lies the key problem here. The district court equated Vaughn Hospitality with the managers in *Smith* and determined that "As the hired manager, [Vaughn Hospitality] wasn't an employer of the hotel staff—it was part of the hotel staff. [Vaughn Hospitality] was an agent, not a principal, and the fact that one agent [Vaughn Hospitality] exercises authority over another agent (Frey) does not render the senior agent the junior's employer." *Frey (employer decision),* 2015 WL 5921580, at *4; R. 97 at 7–8 (Page ID 1991–92) (citing *Smith*, 453 F.3d at 979, 984).

But we cannot evaluate the status of the individual we are trying to sort into either the employer basket or employee basket in the case before us as there is no such individual; there is only a company—Vaughn Hospitality. Just as the *Clackamus* test was misapplied in *Smith*, the *Smith* test has been misapplied in this case. We are not considering whether a particular manager, partner, shareholder, or director is an employee or an employer, or whether a particular person exercised control and authority by right (as an employer) or by delegation at the pleasure of another (as an employee). Nor are we trying to determine whether the employees of smaller affiliated business entities should be aggregated for purposes of

determining whether an employer has fifteen or more em-
ployees. Instead, we are looking at two different unrelated
corporate entities—Hotel Coleman and Vaughn Hospital-
ity—and trying to determine if one or both were Frey's em-
ployer. The *Knight* test is the one a court must use for such
purposes.

And it is not simply that the *Knight* test is best designed
for this purpose, although, of the ones articulated above, it
certainly is. Recall that the *Knight* test simply reflects an "eco-
nomic realities" test which looks to see whether the putative
employer exercised sufficient control. *Love*, 779 F.3d at 702.
But when we look to the precedent in *Smith*, it becomes clear
why it is not applicable here. In *Smith*, our task was to count
workers to see if the employer had at least fifteen employees
such that it could be liable for the discrimination alleged. And
we cannot count a corporation toward the fifteen employee
minimum because it is not an employee at all. Title VII defines
"employee" as "an *individual* employed by an employer." 42
U.S.C. § 2000e(f) (emphasis ours). Just recently the Supreme
Court explained at length what it means when a statute refers
to an "individual" without further defining that term, as is the
case here. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454
(2012). In *Mohamad*, the Court was deciphering the meaning
of "individual" in the Torture Victim Protection Act of 1991,
but its application was broad. Noting how the Court itself has
interpreted the word "individual," the Court stated, "[e]vi-
dencing that common usage, this Court routinely uses 'indi-
vidual' to denote a natural person, and in particular to distin-
guish between a natural person and a corporation." *Id.* The
Court then went on to note that Congress employs the word
"individual" in the same way that the Court has. *Id.* The Court
specifically distinguished the word "individual" from the

word "person" noting that "The Dictionary Act instructs that '[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise … the wor[d] "person" … include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as* individuals. *Id.*, citing 1 U.S.C. § 1 (emphasis in *Mohamad* decision). The phrase "as well as individuals," the Court reasoned, clearly demarcated the term "individual" from "the list of artificial entities that precedes it." *Id*. In other words, although a "person" can be defined to include a business entity or corporation, an "individual" cannot. The *Mohamad* Court thus concluded that unless Congress makes its intention to give the word "individual" anything other than its natural meaning as a single human being, "there must be *some* indication Congress intended such a result." *Id.* at 455 (emphasis in original).

In this case, not only has Congress failed to give any indication that "individual," as used to define an employee in Title VII, could include a corporation, but the statute gives all indications to the contrary. The purpose of the statute, after all, is to make it unlawful to discriminate "with respect to [an employee's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Corporations do not have races, colors, religions, genders or national origins. Individual humans do. Although corporations may have some rights as "persons" because the Dictionary Act includes corporations, associations etcetera as "persons" (See *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768 (2014)), a corporation is not an "individual" that could, for example, file a law suit for discrimination based on race. The test utilized in *Smith,* therefore, simply does not answer the question

we have before us. The *Knight* test, however, does, and should have been the one used below. On remand, the district court should apply the facts of this case to the factors articulated in *Knight*.

The factors articulated in *Knight*, will also apply to an evaluation of whether Vaughn Hospitality can be considered an employer under the Illinois Human Rights Act. Illinois courts often look to federal Title VII law to guide them. *Carter Coal Co. v. Human Rights Comm'n*, 261 Ill. App. 3d 1, 14, 633 N.E.2d 202, 211 (Ill. Ct. App. 1994). And the test for determining an employer-employee relationship under Illinois law is fairly similar:

> Common-law factors to consider in examining a worker's potential status as an employee include the amount of control and supervision, the right of discharge, the method of payment, the skill required in the work to be done, the source of tools, material or equipment, and the work schedule. Of these, control of the manner in which work is done is considered the most important. When analyzing claims of discrimination under the Act, we may look to the standards applicable to analogous federal claims.

*Mitchell v. Dep't of Corr.*, 367 Ill. App. 3d 807, 811, 856 N.E.2d 593, 598 (Ill. Ct. App. 2006) (citations omitted).

Based on the record as set forth in the district court, it seems likely that the district court, applying the *Knight* factors, would conclude that Vaughn Hospitality was indeed Frey's employer, but that decision is for the district court to

make on remand. Nevertheless, we note how those factors appear from our appellate perch.

*Knight* instructs that the putative employer's degree of control is the most important and deserving of the most weight. Vaughn Hospitality had control over every aspect of Frey's work environment. It hired and fired her, determined her compensation and other benefits, supervised, scheduled, and trained her, and evaluated her work. In a contract with Vaughn Hospitality, Hotel Coleman stated that it would not interfere with Vaughn Hospitality's control in all matters of import, noting in particular that it would "not give any direct instructions to any employee of [the Hotel] or to [Vaughn Hospitality] whose instructions may interfere, undermine, conflict with or affect in any manner the authority and chain of command as established by [Vaughn Hospitality]." R. 92-2 at 5 (Page ID 1533). There is no question that Vaughn Hospitality had absolute control of Frey's employment and its conditions. The first, and most important, factor unquestionably points to Vaughn Hospitality as employer.

As dictated by the second *Knight* factor, we look at the type of occupation and the nature of the skills required for the position, including whether those skills were obtained in the workplace. *Knight*, 950 F.2d at 378. We do not know how much skill was required for Frey's position, and where she obtained those skills, as the record is light on these details, but it does not appear that Frey had significant specialized skills that she brought with her to the job. We do know, however, that Vaughn Hospitality provided all of the training at the Hotel and that each employee, including Frey, received a "Vaughn Hospitality Employee Handbook," which set forth employment policies, benefit programs, and other

procedures. Consequently, this factor also points to Vaughn Hospitality as employer.

As for the third and fourth factors—responsibility for the costs of operation and payment of salary and benefits—the point goes to Hotel Coleman for this one. Hotel Coleman owned the property and covered the operating expenses, including the payment of Frey's salary and benefits.

The fifth factor requires the district court to grapple with a number of "what if" factors. The court must look at the length of the job commitment and/or expectations. As far as the record reflects, Vaughn hired Frey as a long-term, at-will employee. The Employee Handbook stated, "we hope your employment relationship with us will be long term." R. 80-4 at 5. This was not a temporary assignment or a contract job that would end at the completion of some task. See, e.g., *Love*, 779 F.3d at 705 (finding that the fifth factor weighed against the plaintiff where it was undisputed that he worked on the project overseen by the general contractor for only eight months and intended to remain employed by the subcontractor and not the general contractor at the end of the project). Frey worked for the Hotel for two years before Vaughn terminated her. Hotel Coleman sold the Hotel in August 2010, and the new owners did not retain Vaughn Hospitality to manage the Hotel. Two employees who worked in positions similar to Frey's, however, continued working for the new owner and there is no reason why Frey might not have as well. Vaughn Hospitality argues that had she not been fired, Frey might have been able to continue working for the Hotel, but under new management, and thus her employment was tied to the Hotel and not Vaughn Hospitality. But on the flip side of that coin, Vaughn Hospitality was a hotel management

company, and therefore it is also a possibility that had she not been fired, Frey may have moved on with Vaughn Hospitality to an assignment at a new hotel. Vaughn Hospitality's argument, therefore, is of no help either way. Vaughn hired Frey as a permanent, long-term employee. The balance on this factor weighs in favor of finding that Vaughn Hospitality was Frey's employer along with the Hotel Coleman.

Although it is true that not every factor points toward Vaughn Hospitality as Frey's employer, the test is a balancing one with different weights added to each side of the scale—the heaviest of which is the degree of control. A plaintiff need not establish that every *Knight* factor falls in her favor in order to prevail. See, e.g. *Love*, 779 F.3d at 705 (a plaintiff can survive summary judgment even when not all *Knight* factors support him). In sum, it was legal error for the district court to fail to apply the *Knight* factors. Had it done so, it seems likely that it would have come to a different conclusion about Vaughn Hospitality as Frey's employer for purposes of Title VII enforcement.

Moreover, and for the same reasons, if Vaughn Hospitality is deemed to be Frey's employer, it is also the joint employer of the other employees in the Hotel. It is undisputed that more than fifteen individuals worked at the Hotel under Vaughn Hospitality's control, therefore we conclude that if Vaughn Hospitality was one of Frey's employers it had a sufficient number of other employees to be a covered employer under Title VII. See 42 U.S.C. § 2000e(b).

On a final note, Vaughn Hospitality claims on appeal that Frey failed to exhaust her administrative remedies because she named Vaughn as her "supervisor" and not her employer in some of her claims before the Illinois Human Rights

Commission and/or the EEOC. Vaughn Hospitality did not raise this issue below and therefore it is waived. In any event, we would find that Vaughn Hospitality had sufficient notice of the claims against it and was able to participate fully in the proceedings before the court. See, e.g., *Tamayo v. Blagojevich*, 526 F.3d 1074, 1089 (7th Cir. 2008).

We vacate the district court's ruling on summary judgment that Vaughn Hospitality was not a joint employer of Frey and remand to the district court for further proceedings that reflect these conclusions.

## B.  Back pay

Our remand on the employer issue does not abrogate our need to resolve the questions raised by Frey on back pay and prejudgment interest, as the remand will not affect the jury's award on the retaliation claim against Vaughn Hospitality.

Prior to trial, in a joint pre-trial memorandum, under the section titled "Plaintiffs Damages and Costs" Frey listed "Back pay: $13,520." After her success on the retaliation claim at trial, the district court asked both parties to brief their positions on additional damages and back pay. In her Brief in Support of Back Pay, Frey claimed that, based on the evidence revealed at trial, the actual amount of back pay dues was $132,242.50—representing some six years during which she would have worked 32.5 hours per week at a rate of $13 per hour. After trial, the district court considered the plaintiff's claim in the pre-trial order, but also conducted its own evaluation of the back pay demand. The court considered how Frey's hours had been cut after she revealed her pregnancy, how her requests for additional hours were unsuccessful, how she was not permitted to apply for a higher paying

position that Vaughn had previously told her she could ex-
pect to obtain, how she was not paid the higher rate ordinarily
paid for night shift work, and several other factors. *Frey (dam-
ages decision)*, 2017 WL 2215013, at *2; R. 162 at 3 (Page ID
2516). The court also calculated her losses using the number
of hours she may have worked per week and the number of
weeks she may have worked multiplied by her hourly rate.
*Id.* at *5; R. 162 at 8–9 (Page ID 2521–22).

The district court both made its own calculation and it also
stated that "Frey is bound by her pretrial representation."
*Frey (damages decision)*, 2017 WL 2215013, at *4; R. 162 at 8
(Page ID 2521). The district court was correct that parties must
be held to the issues set forth in that order and cannot assert
new legal theories at trial. See *Harper v. Albert*, 400 F.3d 1052,
1063 (7th Cir. 2005). But, altering an amount of back pay based
on evidence that emerges at trial does not fall into this same
category as the defendants were, in the first instance, aware
of the issue, and secondly, are unlikely to be taken by surprise
by evidence within its control. See *Id.* A district court has
broad equitable discretion to award back pay to make the Ti-
tle VII victim whole. *David v. Caterpillar, Inc.*, 324 F.3d 851, 865
(7th Cir. 2003). To the extent the district court used its discre-
tion and conducted its own calculation, its award is valid.
However, if the district court awarded this amount because it
concluded that Frey was inalterably bound by her pretrial
representation, then it has erred. Because it is unclear from the
decision which in fact occurred, we remand for the district
court to reconsider the award of back pay within its full dis-
cretion.

Frey argues that she should not have been limited to the
amount of back pay listed in the pretrial order because that

order was not entered or signed by the district court. The parties present various arguments for honoring or not honoring the unsigned pretrial order. We need not resolve this debate. Notwithstanding the pretrial order, the district court had discretion to make the plaintiff whole. *David*, 324 F.3d at 865. We remand to ensure that the district court recognized the full extent of its discretion and equitable powers.

## C. Prejudgment interest

In general, whether and how to award prejudgment interest also lies in the discretion of the district court (*Pickett v. Sheridan Health Care Ctr.*, 813 F.3d 640, 647 (7th Cir. 2016)), although there is a presumption in favor of granting such interest. *Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003). This is particularly true in cases involving remedial statutes like Title VII where the goal is to make a plaintiff whole following violations of a federal statute. Prejudgment interest restores a plaintiff to the position she would have been in but for the violation. "Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Gorenstein Enter., Inc. v. Quality Care— U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). Courts award prejudgment interest because "compensation deferred is compensation reduced by the time value of money," and only prejudgment interest can make the plaintiff whole. *Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997). The district court applied the federal prime rate and Frey argues that it should have applied the state interest rate instead.

In this circuit we have instructed district courts to "use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court

engages in 'refined rate-setting' directed at determining a more accurate market rate for interest." *First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999). We interpret this language, along with the broad grant to the district court of discretion in awarding prejudgment interest, to mean that where there is a state law that "statutorily defines the rate," a district court may use its discretion to determine which is more likely to make the plaintiff whole—the state statute or the prime rate. We are not alone in offering district courts that option. See, e.g., *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 497 (6th Cir. 2013) ("We have held that the method for calculating prejudgment interest remains in the discretion of the district courts, and they are free to look to state law for guidance in determining the appropriate prejudgment interest rate if they so choose") (citations omitted); *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 764 (10th Cir. 1997) (recognizing that because the prejudgment interest award was governed by federal law, a district court is free to choose any interest rate which would fairly compensate the plaintiff for the delay in the receipt of payment including the current state interest rate); *Smith v. Am. Int'l Life Assurance Co. of N.Y.*, 50 F.3d 956, 958 (11th Cir. 1995) (approving the district court's use of state's post-judgment interest rate for guidance in determining the prejudgment interest rate); *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) ("The rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court. In this case the district court found the Virginia judgment rate in Va.Code § 6.1–330.54 appropriate.") (citations omitted).

Particularly in light of the fact that the piece of the litigation on which Frey prevailed below was her retaliation claim under the Illinois State Human Rights Act, it certainly would

be within the court's discretion to look to that statute to determine the prejudgment interest rate. The district court opined, however, that there was no "statutorily defined rate" to which it could look because it concluded that the Illinois Human Rights Act does not provide for pre-judgment interest. It is true that the Illinois Human Rights Act does not use the words "prejudgment interest," in describing remedies, but it does, in fact, describe prejudgment interest. Under the Illinois Human Rights Act, "Upon the finding of a civil rights violation, the circuit court or jury may award any of the remedies set forth in Section 8A-104." 775 ILCS § 5/8-111. That section, in turn, allows for a court to "[t]ake such action as may be necessary to make the individual complainant whole, including, but not limited to, awards of interest on the complainant's actual damages and back pay *from the date of the civil rights violation*." 775 ILCS § 5/8A-104 (emphasis ours). Interest from the date of the civil rights violation to the date of a judgment *is* prejudgment interest. There is, therefore, a statute that addresses pre-judgment interest.

Vaughn Hospitality argues that these statutes in the Illinois Human Rights Act do not include a statutory interest *rate*. It is true that in a technical sense the Illinois Human Rights Act does not itself contain a statutory interest rate but read in light of the other statutes and the administrative code provision, it does indeed provide an interest rate. The Illinois Act allows for an award of interest and then leaves it to the administrative code to hammer out the nuts and bolts of the calculations. See 56 Ill. Admin. Code 5300.1145. In other words, Frey cites two statutes and one regulation which together provide for prejudgment interest for civil actions: (1) 775 ILCS § 5/8-111 addresses "Civil Actions Commenced in Circuit Court" and states that "[u]pon the finding of a civil

rights violation, the circuit court or jury may award any of the remedies set forth in Section 8A-104;" (2) 775 ILCS § 5/8A-104 then allows that court or jury to award interest from the date of the civil rights violation; and finally (3) the Administrative Code, 56 Ill. Admin. Code 5300.1145 provides the formula for calculating that interest. We find this sufficient to provide a "statutorily defined" prejudgment interest rate.

Vaughn Hospitality argues that the Illinois Human Rights Act governs procedural rules of the Illinois Human Rights Commission and not civil actions involving the Act's claims, and therefore its interest rate provisions are inapplicable in this action. The Act, however, regulates both proceedings in the Commission and the Illinois State Circuit Courts. In fact, the very regulation Frey relies on for an award of pre-judgment interest is labeled "Court Proceedings," with subheadings of "(A) Civil Actions Commenced in Circuit Court," and "Judicial Review." 775 ILCS § 5/8-111. This should not preclude a federal court from borrowing the interest rate to use in its own proceedings when using its discretion to determine a prejudgment interest rate. This is particularly true where the federal court is awarding interest based on a successful claim under a state statute via its exercise of supplemental jurisdiction.

Next, Vaughn Hospitality argues that Illinois Administrative Code section 5300.1145, which provides the detailed calculations for the interest rate, is inapplicable because it refers only to cases that have proceeded "under the alternative hearing procedure" of the Act. Not so. Vaughn Hospitality has ignored the first six words of the statute. The Code states "[w]henever an Order and Decision, **or** a Final Order in a case proceeding under the alternative hearing procedure, includes

an award of interest pursuant to Section 8A-104(J) of the Act …" 56 Ill. Admin. Code 5300.1145 (emphasis ours). Clearly the code allows for an award of interest from orders and decisions as well as "from a Final Order in a case proceeding under the alternative hearing procedure." *Id.* More importantly, however, our federal case law allows courts in this circuit to use their discretion to borrow interest rates from a state statute. It does not require that every procedural posture in the federal case match that in the statute.

In short, the district court erred when it concluded that the state statute did not provide for prejudgment interest. The district court may use its discretion to choose either the state statute on prejudgment interest or the prime rate as described by federal law. It cannot exercise its discretion, however, if it does not understand its options. On remand, the district court may use its discretion to determine whether the interest rate from the state statute or the prime rate is more likely to make the plaintiff whole in line with the purposes of Title VII.

## III.

In sum, we VACATE the district court's grant of summary judgment for Vaughn Hospitality on the issue of employer liability, its order on the amount of back pay for Frey's successful state retaliation claim, and its ruling on the prejudgment interest. We remand for further proceedings consistent with this opinion. Costs of the appeal are awarded to the plaintiff.